**A.B.A. AUTO LEASE CORP. and Ernst International, Inc.**

v.

**ADAM INDUSTRIES, INC., et al.**

**Civ. A. No. 74–865.**

United States District Court, E. D. Pennsylvania.

Jan. 9, 1975.

Christopher K. Walters, Philadelphia, Pa., Berkey & Erickson, Bloomfield Hills, Mich., for plaintiffs.

Wilbur Greenberg, Paul R. Rosen, Philadelphia, Pa., for defendants.

MEMORANDUM

GORBEY, District Judge.

This action arises out of franchise agreements which were entered into between the plaintiffs and defendant, Adam Industries, Inc., for an automobile leasing franchise. Defendants have moved to dismiss on the grounds that the counts of the complaint based on violation of the federal securities law (i. e., counts 1 and 4) do not state cause of action under the federal securities laws.

The essential question to be resolved for disposition of this motion is—do the

franchise agreements at issue constitute investment contracts and thus securities within the meaning of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.). Specifically, plaintiffs maintain that counts 1 and 4 allege violations of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b(5) of the Securities and Exchange Commission (17 C.F.R. 240.-10b(5)).

Defendants urge that the case is similar to the recent decision of the Third Circuit in Lino v. City Investing Co., 487 F.2d 689 (1973), where the court held that the franchise agreement in that case did not constitute an investment contract within the meaning of the Act. In the Lino case the Third Circuit rejected a strict interpretation of the classic definition of an investment contract which had come from the case of SEC v. W. J. Howey Co., 328 U.S. 293 at 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), which reads as follows:

> ". . . [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits *solely* from the efforts of the promoter or a third party . . ." (Emphasis added)

In rejecting the strict interpretation, the Third Circuit adopted the reasoning of the Ninth Circuit in the case of SEC v. Glen W. Turner Enterprises, Inc., 474 F.2d 476 at 482 (9th Cir. 1973) and State v. Hawaii Market Center, Inc., 485 P.2d 105 (Haw.1971); stating 487 F.2d at page 692:

> "We find these authorities persuasive. The reasoning of the Supreme Court, the Ninth Circuit, the S.E.C. and Supreme Court of Hawaii leads us to hold that an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.' As the Ninth Circuit realized, to adopt a position similar to City Investing's would lead to easy evasion of the act 'by adding a requirement that the buyer contribute a modicum of effort.'" (citations omitted)

Accordingly, we must, as it was done in the Lino case, "examine the substance and economic reality of this situation rather than the formal characteristics of the parties in interest." Under the license agreements in question, plaintiffs were required to promote the name and reputation of Adam, conduct the business in a reasonable manner suggested and approved by Adam, not commit any act which in the sole judgment of Adam is harmful to the name of Adam, advertise as approved by Adam, spend a specified amount in advertising in the first two months of operation, spend $50 per lease in advertising, comply with all requests for information made by Adam, maintain approved communications equipment and produce a specified number of leases in the first year.[1] Plaintiffs' rights under said agreement were to advertise as an authorized Adam leasing office in an exclusive area; to avail itself of the training provided by Adam; to receive the continuous guidance of Adam management, and the manuals, forms and price sheets provided by Adam, to attend regional seminars provided by Adam, to receive payment by Adam of a certain sum fixed by a schedule attached to the agreement for each lease produced and to have investigation, approval, inspection, titling, dunning and repossession and all other paper work to be done by Adam.

From the agreement it appears that the licensees were to provide prospective lessors of automobiles and that the defendant will then approve such prospective lessor and take care of all arrangements, paper work, details, etc., including titling the car in the name of Adam

---

1. A.B.A. was required to produce at least 30 leases in the first year and Ernst International was required to produce at least 50 leases in the first year.

Leasing Corp. Once the plaintiff licensees forwarded a lease application to Adam, their duties with respect to that lease were essentially completed and if the lease were approved, they received the specified fee from Adam. The promotional material which Adam provided prospective licensees, such as the plaintiffs, describes the licensees as "commissioned salesmen". From a review of the documents it appears that such a characterization reflects the position of the plaintiff licensees except that they also were to be the operator and manager of the regional leasing facilities not just employees.

As consideration for the license granted by Adam, plaintiffs paid $1. In addition, plaintiffs paid a specified sum for training, management and consulting.[2]

Plaintiffs' primary argument is that the license agreements in question place all "essential managerial functions" with the defendants and under the test of SEC v. Glen W. Turner Enterprises, Inc., *supra,* adopted by the Third Circuit in Lino v. City Investing. *Co., supra,* the agreements in question were investment contracts and thus securities within the meaning of the Act. We do not agree.

Plaintiffs point heavily to the allegation that the pricing structure was fixed by Adam and as a result of the prices set by Adam, the leases were not competitive in the local markets where plaintiffs operated, as a result plaintiffs lost substantial sums of money, primarily those paid to Adam under the agreement and expenses incurred in setting up their local offices. Here, it was intended that plaintiffs would open up an office as the authorized representative of Adam Leasing.[3] The plaintiffs were required to produce a certain number of leases under the agreement, and plaintiffs' success or failure was directly related to, among other things, its ability to produce prospective lessees.

Plaintiffs' argument is, in essence, that since the defendants retained enough control over the business to also determine the success or failure of the venture, this agreement is an investment contract. We do not agree. Admittedly this is a close case and it appears defendants have attempted to retain the maximum control without having the license agreement deemed an investment contract. In the case at bar, plaintiffs were obviously required to expend their best efforts. They had to open an office. They admit in paragraphs 17 and 64 of the complaint that they were informed in the promotional material that they would be required to devote their full time to the business and do not allege that this was not so. Plaintiff A. B.A.'s claim for actual damages of "not less than $29,530.63 (including the $8,000 initial fee)" clearly indicates that plaintiff expended significant sums to set up and operate the business in addition to the monies paid to defendant under the agreement. Similarly, plaintiff Ernst claims actual damages of "not less than $23,919.76 (including the $5,000 initial fee)". This indicates that plaintiffs were operating a business not merely turning their money over to others in hopes of making a profit from the efforts of others.[4] If they did not produce, they would not be rewarded.

2. A.B.A. agreed to pay $20,000; $8,000 down and $12,000 to be paid at the rate of $50 per lease, beginning with the 26th lease produced, continuing until the full sum was paid. Ernst agreed to pay $15,000 for training, management and consulting, consisting of $5,000 down and $10,000 to be paid at the rate of $50 per lease payable on a prorata basis by Ernst beginning with the 26th lease produced and continuing until the full sum shall have been paid.

3. The promotional materials attached to plaintiffs' complaint show estimated office and secretarial expenses.

4. The court in *Lino* thought expenditures of this type to be of significance stating at page 693: "The proofs before the district court demonstrated very real work and efforts by Mr. Lino and expenditures by him of some $60,000 for such items as rental, stationery, salaries, meetings, advertising, entertainment, travel, and other indicia of the operation of a going business."

In the Lino case, plaintiff was required:

". . . to open a sales center, staff it, and devote full time and best efforts to his business. He must recruit area distributors for FI programs and train them. The agreements demonstrate that his efforts are not nominal or insignificant. He must recruit area distributors to earn money and to remain as a FI representative."

While not as clearly stated in the agreements before us, as it was in the Lino case, the position of plaintiffs are not dissimilar to that of the plaintiff in Lino.

Plaintiffs argue that since they rely on the actual practices between the parties summary treatment is inappropriate. However, nowhere does plaintiff allege that the actual practice was inconsistent with the documents or contrary thereto. The allegations and arguments as to the actual practices in this case have been carefully considered and we conclude that they do not change the basic position of the parties or the nature of their relationship or the fact that plaintiffs were required to make significant efforts.

■ Plaintiffs further argue that since they were not the "masters of their own economic destiny" the agreements should be deemed investment contracts. This we think misconstrues and inverts the test of "significant efforts" espoused in Lino. Significant efforts does not mean controlling or primary efforts. So long as the efforts required of plaintiff were significant and not nominal, the agreement is not an investment contract. Lino v. City Investing Co., *supra*. Thus we hold that the license agreements in question are not invest-

ment contracts within the meaning of the Act. Accordingly, defendants' motion to dismiss counts 1 and 4 will be granted.

Defendant, Jerome S. Kutner, has moved to dismiss him as a defendant since there is no basis for an action against him. Plaintiffs' claim against Jerome S. Kutner was that of a controlling person within the meaning of the federal securities law.[5] Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t. Since we have held that the agreements in question do not constitute securities within the meaning of the Act, the motion of defendant, Jerome S. Kutner, to dismiss the complaint as to him will also be granted.

While this motion was pending, plaintiffs amended their complaint to include counts 7 and 8 based on the recently enacted Pennsylvania Securities Act of 1972. Act of December 5, 1972, P.L. ——, No. 284, § 101 (eff. January 1, 1973), 70 P.S. § 1–101 et seq. Defendants by letter have asked that their motion to dismiss be amended to include these new counts stating that in their view the standard of what is a security would be the same as under the federal securities laws. Neither side has briefed this issue.

■ Section 102 of the Pennsylvania Securities Act (70 P.S. § 1–102) defines a security as, *inter alia*, an "investment contract". Since this new Act does not contain a definition of an investment contract we will assume that the Pennsylvania legislature intended this to mean the judicially evolved definition.[6] Thus our previous discussion also applies to counts 7 and 8 of the amended complaint and they will also be dismissed.

5. Plaintiffs in counts 2 and 5 of the complaint appear to be attempting to "pierce the corporate veil" to reach defendant Jerome S. Kutner, but in their memorandum assert that their basis for his presence in the case is that of a "controlling person". We conclude that plaintiffs have abandoned their claim that the corporation was the "alter ego" of defendant Jerome S. Kutner.

6. Section 1.2.20.1 of the Rules adopted by the Pennsylvania Securities Commission pursuant to the Pennsylvania Securities Act adopts the "significant managerial efforts" test espoused by the SEC v. Glen W. Turner, Enterprises, Inc., *supra*, and Lino v. City Investing Co., *supra*, cases.