Robert M. SKLAR, Petitioner,

v.

**DEPARTMENT OF HEALTH,**
**Respondent.**

Scott C. Donohue, Petitioner,

v.

**Department of Health, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 25, 2002.

Decided March 11, 2002.

Publication Ordered May 13, 2002.

As Amended June 5, 2002.

---

Robert M. Sklar and Scott C. Donohue, petitioners, pro se.

Steven V. Turner, Harrisburg, for respondent.

PER CURIAM.

Robert M. Sklar and Scott C. Donohue petition for review of an order of the Deputy Secretary for Administration of the Pennsylvania Department of Health.[1] That order, as it applied to the Petitioners,[2] dismissed Sklar's and Donohue's appeals, revoked Sklar's certifications as an EMT and paramedic and placed Donohue's certifications as an EMT and paramedic on probationary status for two years. We affirm the Deputy Secretary's order.

The Emergency Medical Services Office (EMS Office) of the Pennsylvania Department of Health (Department) charged Sklar and Donohue with certain violations of the Emergency Medical Services Act (Act), 35 P.S. §§ 6921–6938.[3] At the time that the charges were brought against them, Sklar was the Executive Director and Vice President of Regional Medical Transport (RMT) and Donohue was a director and an officer. Both Sklar and Donohue were certified by the Department as paramedics and served RMT as ambulance drivers, EMTs, and in other capacities. Neither was authorized to serve RMT as a paramedic.[4]

The EMS Office charged Sklar and Donohue with violations of Section 11(j.1)(1) of the Act, 35 P.S. § 6931(j.1)(1), and issued orders for them to show cause why they should not be sanctioned for those violations. Administrative proceedings

---

1. The Deputy Secretary for Administration was acting as the agency's head.

2. The order also addressed two companies owned and/or operated by Sklar and Donohue, Regional Medical Transport and Medical Transport Management; neither of those companies petitioned for review. A third company, Keystone Medical Response (KMR), filed a petition but we relinquished jurisdiction and remanded the matter back to the Secretary to allow her to amend her order in accordance with a settlement reached with KMR. That settlement has no impact on our disposition of the petitions for review filed by Sklar and Donohue.

3. Act of July 3, 1985, P.L. 164, *as amended.*

4. A person authorized to function as a paramedic, e.g., provide advanced life support (ALS), may do so only for an ambulance service that is licensed as an ALS service and only if that person is authorized by the ambulance service's medical director. *See* 35 P.S. § 6931(d). RMT was never licensed as an ALS service.

were held and disciplinary sanctions were subsequently imposed on Sklar and Donohue, pursuant to Section 11(j.1)(2), 35 P.S. § 6931(j.1)(2). This pro se appeal followed.

Sklar first sought certification as a paramedic in Pennsylvania from the EMS Office in 1993. In that application he disclosed that he had been convicted of the misdemeanor offense of obstructing government operations in the State of Colorado in 1990 (R. 3174a, Finding of Fact No. 14) and that, in 1993, the Medical Director of the Kern County, California, Emergency Medical Services Department had revoked Sklar's certification as a paramedic for carrying items forbidden to paramedics in the State of California.[5] (R. 3175a, Findings of Fact No. 16, 17). Sklar abandoned this application for paramedic certification in Pennsylvania after he failed to produce certain documents requested by the EMS Office. Sklar applied again for certification in Pennsylvania in 1998. The EMS Office, with knowledge of the 1990 misdemeanor conviction and the 1993 disciplinary sanction, but with no evidence of any misconduct since the 1993 sanction, concluded that Sklar had been rehabilitated and granted him paramedic certification on November 2, 1998.

In November of 1998, Sklar met with Nancy Cherone of the Delaware Valley Medical Center (DVMC) to solicit DVMC's ambulance transport business for RMT. Sklar told Ms. Cherone that RMT was authorized to transport advanced life support (ALS) patients when, in fact, RMT was authorized only to provide basic life support (BLS) transport. (R. 801a, 1361a–1364a, Finding of Fact 63, Commonwealth Exhibit 15). In reliance on Sklar's representation that RMT was ALS licensed,

DVMC entered into a contract with RMT, effective in November of 1998, to provide ALS transport services for DVMC. (R. 3178a, Finding of Fact No. 64).

DVMC became the Bucks campus of Frankford Hospital in early 1998 when that institution acquired the assets of DVMC after DVMC declared bankruptcy. Sklar and Donohue separately told representatives of Frankford Hospital that RMT was authorized to transport ALS patients. Donohue, in fact, identified himself as ALS coordinator for RMT. (R. 3179a, Finding of Fact No. 70). One of the representatives the pair spoke to, Dana Pedrick, Director of Clinical Resources Management for the Bucks campus, directed an employee of the Bucks campus to provide RMT with ALS business. That employee asked RMT to transport an ALS patient from the Bucks campus to a hospital in New Jersey. RMT, without permission from Frankford Hospital, arranged for a BLS ambulance service licensed in New Jersey, but not in Pennsylvania, to do the work. (R. 3179a, Finding of Fact No. 74). This was in violation of Section 12(a) and (t) of the Act, 35 P.S. § 6932(a) and (t) that forbid out-of-state ambulances from operating in Pennsylvania except in very limited circumstances. When Ms. Cherone discovered that RMT was not licensed to transport ALS patients she confronted Sklar with that fact. He at first denied it and claimed that RMT had authority pending the receipt of a license, but he eventually admitted that that RMT did not have ALS authority. (CR.1337a, 1379a–1380a).

RMT had applied for an ALS license, but the way it pursued that application also raised concerns with the Department.

5. The Kern County revocation precluded Sklar from serving as a paramedic anywhere in California.

An ALS ambulance service must staff its ambulances with at least one paramedic, professional nurse or physician during the emergency transport of an ALS patient, Section 12(g) of the Act, 35 P.S. § 6932(g), and it must be able to meet this staffing requirement 24 hours a day, 7 days a week, Section 12(n), 35 P.S. 6932(n). In an effort to make it appear that RMT met this requirement, Donohue caused the name of Joseph Barton to be listed as an RMT paramedic on an ALS license application filed by RMT on March 18, 1999. (R.3178a, Finding of Fact 59). Donohue did this knowing that Barton was not employed by RMT and had not authorized RMT to list his name on the application. (R. 3178a, Finding of Fact No. 55).

Sklar personally pursued the issuance of an ALS license to RMT through an aggressive series of almost daily phone calls to the EMS Office. (R. 3175a, Finding of Fact No. 22). In an attempt to limit the impact of these calls, the Director of the EMS Office, Margaret Trimble, eventually directed Sklar to contact only one person at the EMS Office, Robert Gaumer. (CR. 3175a, Finding of Fact No. 27). Mrs. Trimble also directed her staff to keep a log of Sklar's calls, detailing the time, date and content of each call. In a letter to Sklar, legal counsel for the EMS Office informed him of the concern raised by his calls and told him that his conduct might be considered in the context of whether RMT could meet the statutory requirement that it be "staffed by responsible persons" as required by Section 12(h)(1) of the Act, 35 P.S. § 6932(h)(1). (R. 875a–879a, 3176a, Findings of Fact Nos. 30, 31, Commonwealth Exhibit 39).

In his calls to the EMS Office Sklar sometimes disguised his voice and would call repeatedly within minutes of a previous call after being told that Mr. Gaumer was not there but that he would call Sklar as soon as he returned. (R. 824a–833a, Commonwealth Exhibit 37). Sklar identified himself as "Mohamar Khadaffi" and said to a staff person "You know who Khadaffi is? You better think about it." (R. 830a, Commonwealth exhibit 37). Sklar said to members of the EMS Office clerical staff such things as "Don't f__k with me" and "F__k you." (R. 833a, Commonwealth Exhibit 37), "You better stop shittin' with me. I'm telling you, you better stop shittin' with me. You know what happened at Columbine High School."[6] (R. 834a, 880a, Commonwealth Exhibits 37, 40).

Mrs. Trimble, other members of the EMS Office staff and legal counsel for the EMS Office met with Sklar and Donohue on May 5, 1999 to discuss Sklar's inappropriate phone calls in the context of the statutory requirement that an ambulance service must be "staffed by responsible persons." Sklar's conduct, however, did not improve. After the meeting he called the EMS Office 34 times in one day (R. 868a–871a), used profanity (R. 835a–874a) and told EMS Office staff members that they must have marital and mental problems (R. 865a). He told the EMS Office staff that he was recording his phone conversations with them despite being told that he was not authorized to record them. During a visit to the Bucks County EMS Office Sklar told a member of the staff to "go f—k yourself," gave him "the finger" and refused to leave until security was summoned (R. 3177a, Finding of Fact No. 50).

---

**6.** This reference was made in the days immediately following the murders at Columbine High School.

After the administrative proceeding in this matter began, the Department's counterpart in New Jersey suspended Sklar's paramedic certification for two years beginning on May 8, 1998, and imposed an additional 18 months probation to follow that suspension. New Jersey acted after it learned that Sklar had willfully failed to disclose the Kern County, California revocation when he applied for certification in New Jersey. The Department granted an EMS Office motion to amend its show cause orders to include the New Jersey action.

The questions we are asked to determine are 1) whether a crime that includes the element of an intentional act to impede a public servant from carrying out his duties is a crime of moral turpitude; 2) whether a Commonwealth agency may impose more severe discipline for conduct in another jurisdiction than that imposed by the regulatory agency in that jurisdiction; 3) whether substantial evidence exists that Sklar and Donohue misrepresented the status of an ambulance service to a hospital and whether that misrepresentation constituted a threat to public safety; 4) whether a Commonwealth agency may consider pre-certification knowledge of misconduct in imposing sanctions for post-certification misconduct; 5) whether Sklar's conduct over the years since and including his 1990 conviction in Colorado supports the finding that he is not a responsible person in the context of the staffing of an ambulance service; 6) whether a person who is a director, officer and employee of a corporation may argue that a Commonwealth agency committed errors of law or violated the rights of the corporation in its dealings with it; and 7) whether the Department engaged in pre-adjudication misconduct that warrants a reversal of its adjudication and order.[7]

■ The first question we consider is whether a crime that includes the element of an intentional act to impede a public servant from carrying out his duties is a crime of moral turpitude. The Department sought sanctions against Sklar pursuant to Section 11(j.1)(1)(xiv) of the Act, 35 P.S. § 6931(j.1)(1)(xiv)[8], which authorizes disciplinary sanctions against an EMT or paramedic who has been convicted of a crime involving moral turpitude.

In 1990, Sklar was convicted of obstructing government operations in the State of Colorado in violation of Section 18–8–102(1) of the Colorado Criminal Code, C.R.S. § 18–8–102(1), that provides:

> A person commits obstructing government operations if he intentionally obstructs, impairs, or hinders the performance of a government function by a public servant, or by using or threatening to use violence, force or physical interference or obstacle.

Sklar concedes that he was convicted of a misdemeanor offense but dismisses it as a "college prank conviction" (Petitioner's

---

**7.** Our standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether the necessary findings of fact are supported by substantial evidence. 2 Pa. C.S. § 704, *Firman v. Department of State, State Board of Medicine*, 697 A.2d 291 (Pa. Cmwlth.1997), *petition for allowance of appeal denied*, 550 Pa. 722, 706 A.2d 1215 (1998).

**8.** This section reads, in pertinent part, that:

(1) The department may suspend, revoke or refuse to issue or renew the certification or recognition of emergency medical services personnel upon investigation, hearing and disposition for the following reasons:

. . . .

(xiv) Conviction of a felony or crime involving moral turpitude. Conviction includes a judgment of guilt, a plea of guilty or a plea of nolo contendere.

Brief at p. 35) and claims that the Department cannot take disciplinary action against him because he was convicted of "a misdemeanor offense and not a 'crime'." (Id. at p. 34). Sklar offers no support for this remarkable assertion and none exists. A misdemeanor is a crime.

The record reveals that Sklar's behavior in Colorado in 1990 constituted far more than a "college prank." By his own admission Sklar "intentionally attempted to obstruct [police] officers from providing services off campus . . . . [by] interfering with the police communications of officers off campus." (R. 2129a, Letter from Sklar to the Department, 7/18/95). We have defined moral turpitude as "anything done knowingly contrary to justice, honesty, or good morals." *Moretti v. State Board of Pharmacy*, 2 Pa.Cmwlth. 121, 277 A.2d 516, 518 (1971), and have found that a crime that . is "contrary to the common sense of the community" is "a crime involving moral turpitude." *Foose v. State Board of Motor Vehicle Dealers & Manufacturers*, 135 Pa.Cmwlth. 62, 578 A.2d 1355, 1358 (1990). To interfere with police communications in an intentional attempt to prevent police officers from providing services to the community is a crime "contrary to the common sense of the community." Sklar was convicted in Colorado of a crime involving moral turpitude, and the Department acted properly in seeking sanctions against him based on that offense.

■ The second issue is whether a Commonwealth agency may impose a more severe sanction for conduct in another jurisdiction than that imposed by the regulatory agency in that jurisdiction. In 1993 Kern County, California revoked Sklar's paramedic certification [9] and, in 1998, the State of New Jersey imposed a two-year suspension on his certification in that state to be followed by 18 months of probation for his willful failure to disclose the California sanction on his New Jersey application. The thrust of Sklar's argument on this issue is that the Department is somehow estopped from imposing a more severe sanction than the suspension followed by probation imposed by New Jersey. He offers no law to support this assertion and we are aware of none. There is however, support for the Department's decision to revoke where another jurisdiction merely suspended. In *Quintana v. State Board of Osteopathic Medical Examiners*, 77 Pa. Cmwlth. 438, 466 A.2d 250 (1983), we upheld a state agency's decision to revoke a physician's license to practice in Pennsylvania when the state in which his offenses had occurred had merely placed that physician on probation. Sklar's claim is without merit. The Department acted within its authority in imposing a more severe sanction than that imposed by the State of New Jersey.

■ The third question presented is whether substantial evidence exists that Sklar and Donohue misrepresented the status of an ambulance service to a hospital and whether that misrepresentation constituted a threat to public safety. Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion. *Bussa v. Workers' Compensation Appeal Board* (Giles & Ransome, Inc.), 777 A.2d 126 (2001). The record contains the testimony of five individuals from DVMC and Frankford Hospital who were told by Sklar and Donohue that RMT possessed an ALS license (R. 1292a–1295a, 1306a–1314a, 1330a–1334a, 1361a–1362a, 1385a–1388a) and a copy of a promotional flier that

---

**9.** Sklar was re-certified in California some years later but there is no evidence in the record that that re-certification vitiated the Kern County action.

advertised that RMT offered "Advanced Life Support and Critical Care services." (R. 801a, Commonwealth Exhibit 15). The record also contains a copy of a contract signed by Sklar in December of 1999 by which RMT commits to provide ALS service for DVMC (R. 802a–809a, Commonwealth Exhibit 15). The record contains more evidence, but what we have recited is more than sufficient evidence that Sklar and Donohue misrepresented the fact that RMT had an ALS license, and it is not just substantial evidence, it is overwhelming evidence. Sklar and Donohue's arguments to the contrary are simply without merit. The Deputy Secretary's finding of fact that Sklar and Donohue misrepresented the fact that RMT was an ALS service was based on substantial evidence, and there is no question that this misrepresentation constituted a threat to the public safety. Sklar and Donohue's misrepresentation that RMT was an ALS service induced Frankford Hospital to entrust RMT with a patient that required ALS transport. (R. 1291a–1292a, 1344a, 1358a). Sklar and Donohue arranged for an unqualified ambulance service to provide that transport in violation of Pennsylvania law. This transport incident constituted a clear threat to the public safety that was a direct result of Sklar and Donohue's misrepresentation that RMT was ALS licensed.

 The fourth issue in this case is whether the Department properly considered Sklar's pre-certification misconduct when it imposed sanctions for his post-certification misconduct. Sklar argues that since the Department was aware of his Colorado conviction and the Kern County, California revocation of his paramedic license, it is somehow estopped from considering those incidents when it disciplines him for post-certification conduct. Once again, Sklar cites no law for this proposition. The doctrine of equitable estoppel may be applied to a Commonwealth agency; however:

> In order to apply the doctrine of equitable estoppel to a Commonwealth agency, the party to be estopped (1) must have intentionally or negligently misrepresented some material facts; (2) knowing or having reason to know that the other party would justifiably rely on the misrepresentation; and (3) induced the party to act to his or her detriment because of a justifiable reliance upon the misrepresented facts. In addition, one who asserts estoppel must establish the essential elements by clear, precise, and unequivocal evidence.

*Foster v. Westmoreland Casualty Company*, 145 Pa.Cmwlth. 638, 604 A.2d 1131, 1135 (1992) (citations omitted).

Not a single one of these three elements is present here. Sklar was never told that his pre-certification acts would not be considered should the Department have occasion to contemplate post-certification sanctions against him. We find it difficult to imagine that an individual might rely on such a presumption to think that he had somehow been given a "free pass" to commit post-certification infractions. When a Commonwealth agency licenses or certifies an individual it is acting to protect the public, not to benefit the individual, and the public interest must be paramount in its considerations. When the Department certified Sklar as a paramedic it did so with knowledge of his Colorado conviction and the Kern County, California's revocation of his paramedic certification. The Department certified Sklar in spite of these incidents on the presumption that he had been rehabilitated. It did not expunge these incidents but issued its license on the strength of the fact that there was nothing else on Sklar's record from 1993 until his certification in Pennsylvania in

1998. Nothing in our law prevents a Commonwealth agency from considering pre-certification events if an individual's post-certification conduct tends to demonstrate that he is not rehabilitated. Sklar's argument that the Department is estopped from considering his pre-certification conduct is without merit.

We next must determine whether Sklar's conduct since and including his 1990 conviction in Colorado supports the Department's finding that he is not a responsible person in the context of the staffing of an ambulance service. Sklar complains that there is no statutory definition of the term "responsible person," and that the term itself is "unconstitutional and undefined, vague and overly broad." (Petitioner's brief at p. 25). Even if it were properly defined, he maintains, it would apply only to those persons who actually ride the ambulances, not to those individuals who are responsible for the administration of an ambulance service. According to Sklar's reasoning an ambulance service may be owned and operated by irresponsible persons as long as its EMTs and paramedics are responsible. Sklar demonstrated the absurdity of this argument when he, acting as the owner and an administrator of RMT, solicited business for himself by falsely claiming that RMT was an ALS service and then by dispatching a non-ALS-licensed ambulance from another state to handle an ALS transport that his client thought was being done by RMT. No amount of responsibility on the part of the people who actually rode in RMT's ambulances could have prevented that threat to the public safety. To interpret the statute to allow an ambulance service to be administered by an irresponsible person while requiring those riding the ambulances to be responsible would be an absurd result

and we must presume that "the legislature did not intend a result that is absurd . . . . or unreasonable." 1 Pa.C.S. § 1922(1), *Pelter v. Department of Transportation, Bureau of Driver Licensing,* 663 A.2d 844, 848 (Pa.Cmwlth.1995). We reject Sklar's argument because it supports an absurd result.[10]

█ Sklar is correct when he says that there is no statutory definition of "responsible person" to guide the Department in determining who is or is not responsible. This does not, however, mean that the term is unconstitutionally vague. Where a term is not defined in a statute it can be assumed that the legislature intended the term to have a judicially evolved meaning. *A.B.A. Auto Lease Corporation v. Adam Industries, Inc.,* 387 F.Supp. 531, 534 (E.D.Pa.1975).

█ We must first look for the meaning of a statute's word or term in that statute's definitions, then in the Statutory Construction Act, a law dictionary and, finally, a standard dictionary, in that order. It is only when we come to a standard dictionary that we will find a definition for the word "responsible." Webster defines "responsible" as "able to respond or answer for one's conduct and obligations . . . . trustworthy in respect to financial and other matters." (Webster's Third New International Unabridged Dictionary, 1981). The Department relied on another definition of responsible in its Final Adjudication: "answerable, able to fulfill obligations, reliable, trustworthy, able to choose between right and wrong, accountable." (Merriam Webster Dictionary, Home and Office Edition, 1995). Our courts have not defined "responsible" but our sister state of Ohio relied on the New Century Dictionary definition of the word

---

**10.** The fact that Sklar does not understand the fundamental flaw in his reasoning simply adds weight to the Department's argument that he is not a responsible person.

in *State ex rel. Greisinger v. Grand Rapids Board of Education*, 88 Ohio App. 364, 100 N.E.2d 294 (1949), when it found that " 'Responsible' connotes a meaning 'involving accountability,' 'having a mental or moral capacity for knowing right from wrong, in virtue of which one may be held accountable for his acts,' 'capable of rational thought or action,' in addition to ability 'to discharge obligations or pay debts.' " *Id.* at 299. We find no error in the way that the Department defined and applied the term "responsible person."

■ Additionally, we find no error in the Department's determination that Sklar is not a responsible person to staff an ambulance service. Sklar was convicted of a crime of moral turpitude in Colorado and had his paramedic certification revoked in California. The Department took these incidents into account when it certified Sklar as a paramedic in Pennsylvania on the assumption that he was rehabilitated. Sklar repaid that faith in him by lying to hospital officials, arranging for the transport of an ALS patient by an improperly licensed ambulance service in contravention of Pennsylvania law and by verbally and physically harassing members of the EMS Office staff. We find no error in the Department's determination that Sklar is not a responsible person to staff an ambulance service.

Finally, we will address the first three issues that Sklar and Donohue raised in their brief and a number of allegations they have made of misconduct on the part of the EMS Office.

■ In their first issue Sklar and Donohue complain that the Department committed an error of law by denying RMT's default judgment against the EMS Office for failing to file an answer in accordance with 1 Pa.Code § 35.35. We will not address the merits of this argument for two reasons. First, RMT did not petition for review of the Department's order, and any objections it may have to the Department's determinations are not properly before us here. Second, even if RMT had filed a petition for review, RMT is a corporation and must be represented by counsel. *Walacavage v. Excell 2000, Inc.*, 331 Pa.Super. 137, 480 A.2d 281 (1984). Neither Sklar nor Donohue are attorneys. We have already dismissed a petition filed by them on behalf of RMT in our order of August 25, 2000 in *Regional Medical Transport, Inc. v. Commonwealth, et al.* (Pa.Cmwlth. No. 370 M.D.2000) (Respondent's brief, Appendix at A–1). They may not "shoehorn" pleadings on behalf of RMT into the pleadings or petitions brought on their own behalf any more than they may represent RMT directly.

■ In their second issue Sklar and Donohue complain that the Department consolidated their appeals and those of RMT, KMR and MTM into one appeal and then dismissed the consolidated appeals. They say: "There is no provision in the law or rule that allow [sic] for the very appeal that brings us here today. The Department should be reversed and ordered to reinstate the appeals of RMT, Sklar, Donohue and MTM." Petitioners' separate administrative appeals were properly consolidated because all were challenges to the EMS Office decisions that Sklar and Donohue were not responsible persons to staff an ambulance service. The result of this determination was that RMT, owned by Sklar, was denied an ALS license and MTM, owned by Donohue, was denied a BLS license. The appeals sought a reversal of the decisions to deny the licenses. The Department affirmed the determination that Sklar was not a responsible person to staff an ambulance service (R. 3181a, Conclusion of Law 6) and dismissed the appeals of Sklar, RMT and MTM on that basis. The Department dis-

missed Donohue's appeal of the denial of a license to MTM but reversed the determination that he was not a "responsible person" and allowed MTM to reapply for a license if it could demonstrate that Sklar would not be involved in staffing MTM. (R. 3178a). The administrative appeals were dealt with and disposed of properly.

Their third issue is a similar, rambling complaint about the Department's failure to follow procedure that they characterize as "a discriminatory practice on the part of the Department which violated Sklar and Donohue's right to equal protection and equal treatment." (Petitioner's brief at 25). They offer no support for this proposition and, absent some reference to the record or the law, we are unable to determine any.

Finally, we will address the issue of whether any conduct on the part of the Department warrants a reversal of its disciplinary sanctions or its conclusion that Sklar is not a responsible person to staff an ambulance service. Throughout their brief the Petitioners made various allegations of misconduct on the part of the Department that they assert should somehow invalidate the sanctions imposed against them. These allegations, as best as we can interpret them, are that the disciplinary actions brought against them were retribution for their decision to appeal the EMS Office decision to deny RMT an ALS license; that the EMS Office violated a Department order by issuing show cause orders in violation of a Department denial of an EMS Office application to proceed with certain administrative appeals; that the EMS Office considered misconduct in the course of its administrative disciplinary proceeding for which Sklar had been acquitted in criminal pro-

ceedings; and that the EMS Office delayed impermissibly in resolving confusion regarding the status of its occupancy permit with the New Jersey Department of Health.

The EMS Office did not bring disciplinary charges against the Petitioners as retribution for RMT's decision to appeal the denial of an ALS license. The EMS Office told the Petitioners that it would forgo the filing of disciplinary charges if RMT would withdraw its appeal of the denial of its ALS license. The offer was made in an attempt to avoid what the EMS Office contemplated would be a long and expensive process of appeal [11] after it determined that the issuance of an ALS license to RMT would pose more risk to the public than allowing the Petitioners to retain the licenses and certifications that they already possessed. (R. 2103a–2105a). To proceed with the disciplinary charges after the Petitioners declined this offer was not retribution; it was action taken in furtherance of the EMS Office's duty to protect the public interest.

Sklar was charged with criminal harassment for his conduct in regard to members of the EMS Office staff and found not guilty by a judge of the Court of Common Pleas. He cites this acquittal as grounds for his contention that the charged conduct should not have been considered misconduct for purposes of the Act. The flaw in this argument, of course, is that Sklar's conduct in the administrative proceeding was being considered in the context of his fitness to staff an ambulance service, not in the context of whether he had committed a criminal act. The prosecutor's burden in an administrative disciplinary proceeding is far less than in a

**11.** As it turned out the EMS Office was correct. The administrative appeals process produced a record containing over 3000 pages after nine days of hearing and surely countless man-hours spent by the EMS Office staff and its legal staff in preparation.

criminal proceeding. Sklar's contention that his conduct in regard to the EMS Office staff should not have been considered in his disciplinary proceedings is without merit.

In response to a request from the New Jersey Department of Health, the EMS Office informed New Jersey that it could not recommend the issuance of a license to RMT at that time because there was a question as to whether RMT had secured an occupancy permit for the address listed on its Pennsylvania license application. The lack of this recommendation was only one of several reasons that New Jersey gave RMT for its decision to deny RMT a license. (R.1030a, 1031a). After the EMS Office determined that RMT had an occupancy permit for the application address, Sklar, who interpreted the EMS Office communication with New Jersey as a disapproval of the New Jersey application, sought the EMS Office's retraction of the letter to New Jersey. The EMS Office responded to Sklar's request by sending a letter to its New Jersey counterpart advising it that RMT had an occupancy permit. (R. 1209a, RMT Exhibit 3). Sklar was not satisfied with the letter and asked for a retraction of what he construed to be the EMS Office disapproval of RMT's New Jersey application. The EMS Office told Sklar, in writing, that it never disapproved the New Jersey application, that it simply said that it could not recommend it until the issue of the occupancy permit was resolved. (R. 1210a, RMT Exhibit 4). We find nothing here that constitutes misconduct on the part of the EMS Office.

Accordingly, we affirm the order of the Deputy Secretary for Administration.

### ORDER

AND NOW, this 11th day of March 2002, the order of the Deputy Secretary for Administration of the Department of Health in the above-captioned matter is affirmed.