# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Cogan House Township | : | |
| | : | |
| v. | : | No. 1899 C.D. 2017 |
| | : | ARGUED: September 12, 2018 |
| David Lenhart and Dianne Lenhart, | : | |
| Appellants | : | |

BEFORE:　HONORABLE MICHAEL H. WOJCIK, Judge
　　　　　HONORABLE ELLEN CEISLER, Judge
　　　　　HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION BY**
**SENIOR JUDGE LEADBETTER**　　　　　　　　**FILED:　November 15, 2018**


David and Dianne Lenhart (Landowners) appeal from an order of the Court of Common Pleas of Lycoming County (trial court) finding in favor of Cogan House Township (Township) and against Landowners on their counterclaim pertaining to 2011 and 2014 projects performed on Post Road, which runs through their property. Landowners sought to impose liability on the Township and require it to undertake corrective action based on their position that it allowed these projects to be conducted in violation of the Storm Water Management Act (SWMA),[1] the Department of Environmental Protection's regulations (DEP Regulations) promulgated pursuant to the Clean Streams Law,[2] and the Township's Storm Water Management Ordinance (Ordinance). Landowners also asserted common law claims, including willful or gross misconduct, negligence, negligence *per se*, and trespass. They requested equitable relief in the form of a temporary injunction barring the Township from causing future damage and a permanent injunction

---

[1] Act of October 4, 1978, P.L. 864, *as amended*, 32 P.S. § 680.1 - 680.17.
[2] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1 - 691.1001.

directing it to perform reasonable remedial measures. After granting the parties' request to bifurcate the issue of liability from damages, viewing the property, and holding a four-day trial on liability only, the trial court entered a verdict in favor of the Township. We reverse and remand for further proceedings consistent with this opinion.[3]

This matter originated with the Township's 2011 approval of the request of two gas companies, Anadarko and Range Resources, to employ an engineering firm to design and oversee road improvements to Post Road in anticipation of gas drilling activities to be conducted in the area. (October 12, 2017, Opinion "Op.," Finding of Fact "F.F." No. 3.) Following the 2011 and 2014 projects, the Township filed an August 2014 two-count complaint against Landowners asserting that, without authority, they improperly interfered with a drainage system and easements along Post Road. In July 2016, Landowners filed a fourth amended counterclaim, which is now at issue, asserting that the Township caused modifications to be performed on Post Road in violation of the aforementioned law, ordinance, and regulations. In addition, they averred that the modifications had a direct, material and negative effect on the condition and value of their property. When the trial court rendered a verdict on the counterclaim, it also entered an order dismissing the Township's complaint. The trial court subsequently denied Landowners' post-trial motions and entered final judgment in favor of the Township. Because the Township did not appeal from the dismissal of its complaint, we

---

[3] On review of a non-jury verdict, we are limited to determining whether there is competent evidence to support the trial court's findings and whether it committed an error of law. *John Spearly Constr., Inc. v. Penns Valley Area Sch. Dist.*, 121 A.3d 593, 601 (Pa. Cmwlth. 2015). In addition, we must give the same weight and effect on appeal to the court's findings as the verdict of a jury. *Id.* Finally, we must view the evidence in the light most favorable to the verdict winner. *Id.*

consider only the appeal from the order entering a verdict in favor of the Township on Landowners' counterclaims.[4] We have combined and summarized the eight issues Landowners raise on appeal as follows: (1) whether the trial court erred in ruling that the Township did not engage in alteration or development of land for purposes of the SWMA and the Ordinance; (2) whether the trial court erred in determining that the Township's activities constituted road maintenance and not road construction or reconstruction for purposes of DEP's Regulations; and (3) whether the trial court erred in failing to address Landowners' common law claims and request for equitable relief. We answer each in the affirmative.

### I. The Alteration or Development of Land and Storm Water Runoff

By way of a framework for our statutory analysis, we note that Section 13 of the SWMA provides:

Duty of persons engaged in the development of land

Any landowner and any person engaged in the *alteration or development of land which may affect storm water runoff characteristics* shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to

---

[4] Following oral argument, Landowners filed an uncontested application for post-communication submission advising this Court that the common pleas judge who rendered the non-jury verdict, the Honorable Dudley N. Anderson, had assumed senior judge status. Presumably, Judge Anderson will be available as a senior judge to comply with our directives on remand. To the extent we remand as to most issues only for an assessment of damages, Judge Anderson's availability takes on less significance since the trial was bifurcated as to damages. However, even where this is not the case, we note that our Supreme Court recently considered the issue of the proper role of an appellate court when reviewing a non-jury decision where it deemed the trial court's opinion inadequate under Pennsylvania Rule of Appellate Procedure 1925(a), but the judge was no longer available to render a supplemental opinion. In *Dolan v. Hurd Millwork Co.*, ___ A.3d ___ (Pa., No. 51 MAP 2017, filed October 17, 2018), the Court determined that an appellate court under such circumstances could decide whether the trial court correctly decided the legal issues and whether the findings of fact were supported by competent evidence.

3

*prevent* injury to health, safety or other property. Such measures shall include such actions as are required:

(1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or

(2) to manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from *possible* injury.

32 P.S. § 680.13 (1) and (2) (emphasis added).

Landowners argue that the trial court erred in concluding that the Township's activities did not constitute "the alteration or development of land which may affect storm water runoff characteristics," citing the transformative and invasive nature of the work performed. As we will discuss in detail, the trial court determined that the work performed did not satisfy that triggering phrase based on its finding of fact that the work did not exceed the original location and graded area of Post Road. In interpreting that phrase "[w]e must first look for the meaning of a statute's word or term in that statute's definitions, then in the Statutory Construction Act [of 1972 (Statutory Construction Act)], a law dictionary and, finally, a standard dictionary, in that order." *Sklar v. Dep't of Health*, 798 A.2d 268, 276 (Pa. Cmwlth. 2002).

The definitional section of the SWMA provides no statutory definition for "alteration or development of land." It defines "storm water" as "[d]rainage runoff from the surface of the land resulting from precipitation or snow or ice melt." Section 4 of the SWMA, 32 P.S. § 680.4. The Statutory Construction Act provides that when words in a statute are not defined, they shall be construed according to their common and approved usage. 1 Pa. C.S. § 1903. It also provides that, in construing a statute, we must consider the provision as a whole and in context. *Id.*

4

We conclude that the legal definitions for the phrase's operative terms reflect their common and approved usage. In pertinent part, "alteration" is defined as "[a] substantial change to real estate . . . ." Black's Law Dictionary 90 (9th ed. 2009). The definition of "development," in pertinent part, provides: "A substantial human-created change to improved or unimproved real estate . . . ." *Id*. at 516. The key term and common thread in both definitions is "substantial change." If one were to substitute "substantial change" for "alteration or development" and "drainage" for "storm water" in the statute, the plain meaning of the legislature's word choices would be preserved. In other words, if a landowner or person engages in a substantial change of land that may affect drainage runoff characteristics, then that person is obligated to take measures "to ensure that development does not increase the rate of storm water runoff *or* to manage the increased run-off in a manner that protects health and property." *Youst v. Pa. Dep't of Transp.*, 739 A.2d 625, 628 (Pa. Cmwlth. 1999) (emphasis added).

Moreover, mindful of the legislature's use of the word "may" in the phrase "may affect storm water runoff characteristics," we emphasize that Section 13 imposes a duty to implement measures to *prevent* injury from changes in runoff that *may or may not* occur. Thus, the issue as to liability is not whether, in hindsight, runoff was in fact affected, but whether the statutory duties were triggered by the potential of such effects. In other words, the duty to follow the dictates of the statutory provision is neither negated nor cured by whether or not runoff, ultimately, was altered. Of course, the amount of such an effect may be relevant to the issue of damages, but this case has not reached that stage of the proceedings.[5]

Turning to the Ordinance, which resembles Section 13 of the SWMA in its use of the phrase alteration or development of land, we note generally that the

---

[5] Evidence was presented in the present case that storm water runoff was affected.

Ordinance refers to the SWMA as the Township's primary authority for regulating storm water management. (Article "Art." I, Section 104(A) of the Ordinance; Reproduced Record (R.R.), Volume "Vol." 2 at 909a.) Regarding the importance of that regulation, the Township stated: "A comprehensive program of stormwater management, including reasonable regulation of development and activities causing accelerated runoff, is fundamental to the public health, safety and welfare and the protection of people of the Commonwealth, their resources and the environment." (Art. I, Section 102(B); R.R. at 908a.) To that end, the Ordinance requires preparation and implementation of an approved Storm Water Management Site Plan for all "regulated activities" and no such activities are to commence until the Township issues written approval of a plan. (Art. III, Section 301(A); R.R. at 916a.) "Regulated activities" are defined as follows: "Any Earth Disturbances or any activities that involve the *alteration or development of land in a manner that may affect stormwater runoff*." (Art. II; R.R. at 914a) (emphasis added). "Earth disturbance" is defined as "[a] construction or other human activity which disturbs the surface of the land, including, but not limited to, clearing and grubbing; grading; excavations; embankments; road maintenance; building construction; the moving, depositing, stockpiling, or storing of soil, rock or earth material." (*Id*.; R.R. at 912a.) Accordingly, given the fact that the Township adopted the Ordinance under the SWMA and that their stated purposes are the same, we afford the phrase an identical interpretation in both contexts.

In the present case, the trial court reasoned that the work completed did not constitute alteration or development of land under Section 13 and, therefore, the Ordinance, concluding: "The original location of the road and accompanying ditches was maintained and existing pipes were replaced in their original locations." (Op. at p. 5.) In addition, it found that "construction activities in both projects all

6

occurred within the original graded area between the existing toes of fill slopes and tops of cut slopes on either side of the road and any associated drainage features; i.e., within the existing road cross-section."[6] (F.F. No. 14.) Mindful of the foregoing statutory analysis, we reject the trial court's conclusion.

As an initial matter, there is no competent evidence to support the determination that the work performed was limited to the original location and graded area of the road, and some evidence to the contrary. As a transportation engineer testifying on behalf of the Township acknowledged, the pre-construction width of the road was as narrow as twelve feet and the post-construction width was twenty feet of macadam. (September 7, 2017, Hearing, Notes of Testimony (N.T.) at 8-9, 28-29, and 62; R.R., Vol. 1 at 314-15a, 334-35a, and 368a.) Consistent with that testimony, the trial court found that the contractor established four-foot stone shoulders on both sides of the road. (F.F. No. 6.) Accordingly, there is no support for the trial court's primary reason for determining that there was no alteration or development of land.

Additionally, the trial court's own findings regarding the undisputedly invasive nature of the activities undertaken contradict its conclusion that there was no alteration or development of land. As the trial court found, before completion of the 2011 project, Post Road was primarily gravel-covered, with occasional segments tarred and chipped, and the road surface was between twelve to sixteen feet wide with two-foot stone shoulders on both sides. (F.F. No. 5.) "The renovations on Post Road comprised an area of just shy of one mile in length along the north-south stretch of the road." (F.F. No. 6.) This length was subject to the reclamation of a sixteen-foot cart-way, "which involved grinding the roadway surface to a depth of one foot,

---

[6] "The existing road cross-section consists of the original graded area between the existing toes of fill slopes and tops of cut slopes on either side of the road and any associated drainage features." 25 Pa. Code § 102.1.

7

mixing powdered cement and water with the ground material, laying that mixture on the cart-way and topping that with three inches of blacktop." (*Id*.) Four-foot stone shoulders also were established on both sides. (*Id.*)

The undisputed nature of the piping installed provides further indicia of alteration or development of land that could affect storm water runoff characteristics. In that regard, before reclamation work on the roadway itself, "pipes under the road were replaced with similar-sized pipes, including two pipes which carried streams under the road." (F.F. No. 7.) Even though a new pipe was not added at the Kyle driveway, the Township's contractor replaced a completely clogged and buried six-inch diameter pipe with a twenty-four inch pipe at that location. (*Id*.) Additionally, "[i]n 2014, an under-drain was installed in the ditch to the east side of the road for approximately 1000 feet, to carry underground water from the points of seepage to the end of the drain, which empties into a culvert which runs from the east side of the road to the west side." (F.F. No. 9.) At that time, "the cracks in the road were also repaired, the entire road was overlaid with additional blacktop and a 1000-foot section of berm (adjoining the ditch which contained the under-drain) was paved on the east side." (F.F. No. 10.) A civil engineer specializing in water resources testifying on behalf of the Township was unable to dispute, and in fact agreed, that an increase in water volume resulted from the piping installed and the work performed. (September 8, 2017, Hearing, N.T. at 51; R.R., Vol. 2 at 691a.) The following colloquy between the trial court and that witness is illustrative:

> THE COURT:
>
> I don't understand how you can put in a brand new pipe that is unobstructed and have that water come down the east side of Post Road, hit the pipe, go over to the west side and now come down toward [Landowners'] property without increasing the volume of water.

8

What am I missing here? If it was clogged, if that pipe was inoperable, wouldn't the water pool on the east side of the road and never get to the west side of the road?

WITNESS:

That's a good point.

. . . .

THE COURT:

So is the answer to my question that there could have been a greater volume of water cascading onto [Landowners'] property after the pipe issue was resolved?

THE WITNESS:

There could and would have been actually.

. . . .

THE WITNESS:

And it would be the same effect as if the pipe had been properly maintained and cleaned out on a periodic basis.

THE COURT:

So [Landowners'] conclusion that there is increased volume of water as a result of this road project may very well be correct because of the added volume that the improved transportation system has provided?

THE WITNESS:

Yes.

(*Id*. at 50-51; R.R. at 690-91a.)

Based on the foregoing, we must conclude that the work described constituted alteration or development of land that affected storm water runoff characteristics. To that end, we reverse the trial court's determination to the contrary and remand for further evidence as to the amount of damages, if any, which resulted

9

from the Township's failure to comply with the aforementioned law and ordinance provisions.

## II. DEP's Regulations

Landowners argue that the trial court erred in construing DEP's Regulations found in Chapters 102 and 105 of Title 25 of the Pennsylvania Code, which respectively, pertain to "erosion and sediment (E&S) control" and "dam safety and waterway management." Specifically, Landowners maintain that the trial court erred in construing Chapter 102 of DEP's Regulations and determining that the work performed constituted road maintenance and not road construction or reconstruction. In addition, they argue that the trial court erred in construing Chapter 105 of DEP's Regulations and determining that the Township's failure to procure a permit for the pipe replacement for the Bear Run tributary was irrelevant. We turn first to DEP's Regulations pertinent to road maintenance.

## A. Chapter 102 of DEP's Regulations

Chapter 102 of DEP's Regulations applies to those who engage in "earth disturbance activities." Those activities, which include road maintenance, are defined as follows:

> A construction or other human activity which disturbs the surface of the land, including land clearing and grubbing, grading, excavations, embankments, land development, agricultural plowing or tilling, operation of animal heavy use areas, timber harvesting activities, *road maintenance activities*, oil and gas activities, well drilling, mineral extraction, and the moving, depositing, stockpiling, or storing of soil, rock or earth materials.

10

25 Pa. Code § 102.1 (emphasis added).[7] The term "road maintenance activities" means "[e]arth disturbance activities within the existing road cross-section," and, in pertinent part, includes the following: shaping or restabilizing unpaved roads; shoulder grading; slope stabilization; cutting of existing cut slopes; reshaping and cleaning drainage ditches and swales; pipe cleaning; pipe replacement; and support activities incidental to resurfacing activities. *Id*.

In concluding that the work performed was road maintenance, the trial court stated, *inter alia*, that the full-depth reclamation could be characterized as "restabilizing unpaved roads." In addition, it noted that the replacement of pipes and cleaning of drainage ditches similarly were enumerated in the regulation as road maintenance activities. However, like our determination that the work performed constituted alteration or development of land, we similarly conclude that it exceeded road maintenance under DEP's Regulations.

As an initial matter, the trial court's findings of fact do not support a determination that a full-depth reclamation was tantamount to merely restabilizing an unpaved road. As noted, the recovery of a sixteen-foot cart-way entailed highly invasive and comprehensive measures such as grinding the roadway surface to a depth of one foot, mixing powdered cement and water with the ground material, laying that mixture on the cart-way and topping that with three inches of blacktop. (F.F. No. 6.) In addition, the Township's contractor established four-foot stone shoulders on both sides of the road, clearly exceeding shoulder grading. Finally, the work entailed more than nominal pipe replacement in that the Township's contractor replaced a six-inch pipe with a twenty-four inch pipe. (*Id*., No. 7.)

_____

[7] This regulation is consistent with the Ordinance's definition for "earth disturbance" set forth on page six of this opinion.

11

Additional factors indicative of road construction or reconstruction include the fact that the Township's contractor widened the roadway and shoulder and changed the roadway surface from gravel to fully paved. As a transportation engineer testifying for the Township acknowledged, the pre-construction width of the road was as narrow as twelve feet and that the post-construction width resulted in twenty feet of macadam. Accordingly, we conclude that the work performed constituted road construction or reconstruction rather than road maintenance.

This conclusion relates directly to Landowners' argument that the trial court erred in holding that the project did not require a National Pollutant Discharge Elimination System (NPDES) permit pursuant to 25 Pa. Code § 102.5, (DEP's Regulation pertaining to permit requirements relating to erosion and sediment control). Subsection (a) of the regulation, in pertinent part, requires a permit for earth disturbance activity greater than one acre except for road maintenance activities. Specifically, the disputed regulation provides:

> (a) *Other than* agricultural plowing or tilling activities, animal heavy use areas, timber harvesting activities or *road maintenance activities, a person proposing an earth disturbance activity that involves equal to or greater than 1 acre (0.4 hectare) of earth disturbance*, or an earth disturbance on any portion, part, or during any stage of, a larger common plan of development or sale that involves equal to or greater than 1 acre (0.4 hectare) of earth disturbance, *shall obtain an individual NPDES Permit* or coverage under a general NPDES permit for Stormwater Discharges Associated With Construction Activities *prior to commencing the earth disturbance activity*. In addition to other applicable requirements, persons required to obtain an Individual NPDES Permit for Stormwater Discharges Associated With Construction Activities for projects proposed in special protection watersheds shall evaluate and use BMPs [best management practices] in accordance with antidegradation requirements in §§ 102.4(b)(6) and 102.8(h) (relating to erosion and sediment control

requirements; and PCSM [post-construction storm water management] requirements) regardless of whether the discharge is new, additional or increased.

> (b) A person proposing a timber harvesting or road maintenance activity involving 25 acres (10 hectares) or more of earth disturbance shall obtain an E&S Permit under this chapter prior to commencing the earth disturbance activity.

25 Pa. Code § 102.5(a) and (b) (emphasis added). The trial court concluded that no permit was required, reasoning:

> As the earth disturbance activity here involved more than one acre, sub-section (a) could apply to require the NPDES permit, but since that sub-section excludes "road maintenance activities" and the court has already determined that the projects here are properly classified as such, sub-section (b) applies instead. Under that sub-section, no permit was required since the activity involved less than 25 acres.

(Op. at pp. 8-9.)

In light of our conclusion that the work performed constituted road construction or reconstruction, rather than road maintenance, the trial court's determination must be reversed.

The trial court also concluded, contrary to Landowners' claim, that the Township was in compliance with 25 Pa. Code § 102.4(b)(1) and (2). That provision, pertaining to erosion and sediment control requirements, provides:

> (b) For earth disturbance activities other than agricultural plowing or tilling or animal heavy use areas, the following erosion and sediment control requirements apply:

> (1) The implementation and maintenance of E&S BMPs [erosion and sediment best management practices] are required to minimize the potential for accelerated erosion and sedimentation, including those activities

13

which disturb less than 5,000 square feet (464.5 square meters).

> (2) A person proposing earth disturbance activity shall develop and implement a written E&S Plan under this chapter if one or more of the following criteria apply:

>> (i) The earth disturbance activity will result in a total earth disturbance of 5,000 square feet (464.5 square meters) or more.

>> (ii) The person proposing the earth disturbance activities is required to develop an E&S Plan under this chapter or under other Department regulations.

>> (iii) The earth disturbance activity, because of its proximity to existing drainage features or patterns, has the potential to discharge to a water classified as a High Quality or Exceptional Value water under Chapter 93 (relating to water quality standards).

25 Pa. Code § 102.4(b)(1) and (2).

In interpreting Section 102.4(b), the trial court acknowledged that the earth disturbance activities of the Post Road improvements triggered the requirement in Section 102.4(b) for erosion and sediment control, concluding that the Township's contractor implemented and maintained erosion and sediment control best management practices in compliance with Section 102.4(b)(1). In addition, it concluded that the Township's contractor performed a storm water management analysis, and "through utilization of Best Management Practices, implemented an erosion and sediment control plan, thus also complying with Section 102.4(b)(2)."[8]

---

[8] In pertinent part, the trial court found as follows regarding what the Township's contractor did and did not do:

> 11. [The Township's contractor] did utilize Stormwater Best Management Practices in both projects.

> 12. [The contractor] did prepare a stormwater management analysis prior to beginning construction in 2011, and concluded that it met the stormwater management requirements by simply utilizing

14

(Op. at 3.) However, contrary to the requirement of Section 102.4(b)(2), no written E&S plan was submitted, let alone approved. Since, as the trial court noted with regard to the permit requirement, it is undisputed that the earth disturbance exceeded one acre, which is a far greater area than 5000 square feet. Therefore, we agree that the Township failed to comply with Section 102.4(b)(2).

Accordingly, we remand for further evidence as to the amount of damages, if any, which resulted from the Township's failure to comply with Chapter 102 of DEP's Regulations.

## B. Chapter 105 of DEP's Regulations

Turning to Chapter 105 of DEP's Regulations,[9] which, in pertinent part, pertains to waterway management, the trial court acknowledged that the Township failed to comply with Chapter 105 by not applying for a permit when replacing the

---

> Stormwater Best Management Practices because it was matching existing drainage conditions, replacing pipes in their prior locations and directing flow through natural drainage areas.
>
> 13. [The Township's contractor] did not submit an erosion and sediment control plan as part of a permit application for either project, based on its assessment that the projects were "roadway maintenance projects" involving less than 25 acres.
>
> . . . .
>
> 15. A permit was obtained for the replacement of the pipe which carried Bear Run under Post Road. An erosion and sediment control plan was submitted in connection with that permit application.

(F.F. Nos. 11-13, and 15.)

[9] The Township mistakenly asserts that Landowners waived any issues pertaining to Chapter 105 for failure to argue them in their brief. (Township's Brief at 16 n.4.) In addition to including Chapter 105 in the statement of issues segment of their appellate brief, Landowners discussed it on pages twenty-six and twenty-eight of their brief. By way of observation, it is not difficult to fathom why Landowners did not dwell on it in their brief in light of the trial court's conclusion that "[t]he Township did violate 25 Pa. Code Chapter 105 by not applying for a permit for the pipe replacement in the tributary of Bear Run, but that violation did not cause any damage to [Landowners'] property." (Conclusion of Law No. 3.)

15

thirty-three inch pipe for the tributary of Bear Run near their driveway. However, the trial court concluded that Landowners failed to provide credible evidence that the failure to obtain such a permit resulted in any damage to their property. In so determining, the trial court weighed the expert testimony and concluded:

> [Landowners'] expert witness opined that the culvert is under-sized because it drained 123 acres prior to the Post Road improvements and 144 acres thereafter, but his addition of the 20 acres north of the east-west section of Post Road is not supported by the evidence. There is a ditch along the north side of that section of road which drained that 20 acres to the same place before and after the 2011 and 2014 improvements . . . . Thus, the actual comparison is 123 acres to 124 acres, an increase of less than one percent.

(Op. at pp. 9-10.)

Because the trial court found that there was insufficient evidence to support a finding of damage, it held there could be no liability for failure to procure a permit. (*Id*. at p. 10.) We disagree. First, the trial court failed to acknowledge the existence of other evidence of harm,[10] and we have no basis to conclude that any such evidence was discredited. Moreover, the trial was bifurcated as to damages so there was no reason Landowners should have submitted all of the relevant evidence of harm, so we cannot presume that they did so. Accordingly, we (1) reverse the trial court's determination that the Township's failure to comply with Chapter 105 of DEP's Regulations by not applying for a permit for the pipe replacement in the tributary of Bear Run was irrelevant because that violation did not cause any damage to Landowners' property; and (2) remand for additional evidence, where necessary,

---

[10] For instance, a civil engineer testifying on behalf of Landowners opined that one of the adverse effects of the Township's activities was the advent of new wetlands resulting in the loss of the use of certain areas of their property.

16

and pertinent findings of fact and conclusions of law as to any damages that Landowners may have sustained.

### III. Common Law Claims and Request for Equitable Relief

Finally, Landowners maintain that the trial court erred in failing to address their common law claims and request for equitable relief. We agree.[11] As we have previously observed, in addition to the SWMA, common law provides that an owner of land who constructs a drain depositing increased water flow onto a neighbor's land can be held liable for damage to the land that results therefrom. *Glencannon Homes Ass'n, Inc. v. N. Strabane Twp.*, 116 A.3d 706, 720 (Pa. Cmwlth. 2015) [citing *Miller v. Laubach*, 47 Pa. 154 (1864)]. Accordingly, we remand for the trial court's consideration of Landowners' common law claims and request for equitable relief, which may include additional evidence and must include pertinent findings of fact and conclusions of law.

### IV. Conclusion

Accordingly, we reverse the judgment in favor of the Township on Landowners' counterclaim and remand for further proceedings in accordance with this opinion.

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

---

[11] We note that this Court previously entered an order denying Landowners' application for relief requesting summary remand on this basis. However, our refusal to undertake a piecemeal determination of this issue separate from the others in no way impacts our consideration here.

17

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Cogan House Township | : | |
| | : | |
| v. | : | No. 1899 C.D. 2017 |
| | : | |
| David Lenhart and Dianne Lenhart, | : | |
| Appellants | : | |

# **O R D E R**

AND NOW, this 15th day of November, 2018, the judgment of the Court of Common Pleas of Lycoming County is hereby REVERSED. This matter is REMANDED for further proceedings in accordance with the foregoing opinion. Jurisdiction relinquished.

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge