Dr. J.C. Garner, O.D., :
     Petitioner :
 v. :
            :
Bureau of Professional and :
Occupational Affairs, State :
Board of Optometry, : No. 1938 C.D. 2013
     Respondent : Submitted: June 27, 2014


BEFORE: HONORABLE DAN PELLEGRINI, President Judge
     HONORABLE ROBERT SIMPSON, Judge
     HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COVEY         FILED: July 30, 2014


    Dr. J.C. Garner, O.D. (Garner) petitions this Court for review of the Department of State, Bureau of Professional and Occupational Affairs, State Board of Optometry's (Board) September 26, 2013 order suspending his license under Section 7 of the Optometric Practice and Licensure Act (Optometry Act),[1] issuing a public reprimand and imposing a $2,500.00 civil penalty. The issues for this Court's review are: (1) whether the Board erred by concluding that Garner's conviction was for crimes involving moral turpitude; (2) whether the Criminal History Record Information Act (CHRIA)[2] limits the Board's consideration to crimes related to the practice of optometry; and, (3) whether the Board's penalty constituted an abuse of discretion. Upon review, we affirm.

    The facts in this case are undisputed. Garner has held a license to practice optometry in the Commonwealth of Pennsylvania (License No. OEG001105)

---

[1] Act of June 6, 1980, P.L. 197, *as amended*, 63 P.S. § 244.7.
[2] 18 Pa.C.S. §§ 9101-9183.

since 1988. Garner allowed his license to become inactive as of November 30, 2006 in order to pursue other career paths.[3] In 2006, he began working as a freight train conductor for Norfolk Southern Railroad. In 2009, he was elected as a Pennsylvania State Constable in South Hanover Township, Dauphin County.

On April 14, 2011, a Dauphin County jury found Garner guilty of three counts of official oppression and two counts of impersonating a public servant. These convictions stemmed from Garner stopping female motorists, presenting a badge and demanding their personal information. The crimes are classified as second-degree misdemeanors. On June 29, 2011, Garner was sentenced, *inter alia*, to two months of work release, 250 hours of community service and three years of probation.[4]

On June 1, 2012, the Board issued an Order to Show Cause against Garner alleging that it was authorized to suspend or revoke his license or impose a civil penalty under Section 7(a)(5) of the Optometry Act "in that [Garner] was convicted of a crime involving moral turpitude." Certified Record (C.R.) Item 1, Order to Show Cause at ¶ 15. On June 29, 2012, Garner admitted his convictions, but "[d]enied in the strongest terms that [he] was convicted of a crime involving moral turpitude." C.R. Item 2, Ans. to Complaint & New Matter at ¶ 15. After several continuances, a Board hearing was held on March 21, 2013. On September 26, 2013, the Board issued a Final Adjudication and Order indefinitely suspending Garner's license for not less than three years, issuing a public reprimand and imposing a civil penalty of $2,500.00. Garner appealed to this Court.[5]

---

[3] According to Section 5(d) of the Optometry Act, 63 P.S. § 244.5(d), prior to this disciplinary action, in order to reactivate his license, Garner merely had to pay the necessary fees and show that he satisfactorily completed his interim continuing education requirements.

[4] Garner contends that he appealed his conviction to the Superior Court (M.D.A. 1355-2011) and that his appeal is still pending. *See* Certified Record Item 2, Ans. to Complaint & New Matter at ¶¶ 26, 28-29.

[5] "Our scope of review of appeals from adjudications by the Board is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether

Garner first argues that the Board erred by concluding that his convictions were for crimes involving moral turpitude. We disagree. Section 4(a) of the Optometry Act requires that the Board's licensees must be "of good moral character." 63 P.S. § 244.4(a). Section 7 of the Optometry Act also states, in relevant part:

> (a) The [B]oard shall have the power to refuse, revoke, limit or suspend a license, or take other corrective action authorized hereunder against an optometrist licensed to practice optometry in this Commonwealth for any or all of the following reasons:
>
> . . . .
>
> (5) **Conviction of** a felony or **a crime involving moral turpitude**. Conviction shall include a finding or verdict of guilt, an admission of guilt or a plea of nolo contendere.

63 P.S. § 244.7 (emphasis added).

"Moral turpitude" is not defined in the Optometry Act. However, this Court has held that the term is not unconstitutionally vague and "is capable of being defined as evidenced by court decisions which determine that certain offenses are crimes involving moral turpitude." *Foose v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 578 A.2d 1355, 1357 (Pa. Cmwlth. 1990). In *Moretti v. State Board of Pharmacy*, 277 A.2d 516 (Pa. Cmwlth. 1971), this Court defined "moral turpitude" as "anything done knowingly contrary to justice, [h]onesty, or good morals."[6] *Id.* at 518 (quotation marks omitted). A "[d]etermination of whether a crime involves moral turpitude turns on the elements of the crime, not on an independent examination of

---

necessary findings of fact are supported by substantial evidence." *Rand v. Pennsylvania State Bd. of Optometry*, 762 A.2d 392, 394 n.2 (Pa. Cmwlth. 2000).

[6] The *Moretti* Court's definition has been repeatedly upheld. *See Sklar v. Dep't of Health*, 798 A.2d 268 (Pa. Cmwlth. 2002); *Krystal Jeep Eagle, Inc. v. Bureau of Prof'l & Occupational Affairs*, 725 A.2d 846 (Pa. Cmwlth. 1999); *Foose*.

the details of the behavior underlying the crime."[7] *Startzel v. Dep't of Educ.*, 562 A.2d 1005, 1007 (Pa. Cmwlth. 1989). The *Foose* Court explained:

> [A licensing b]oard is empowered to interpret the intention of the legislature when the words of [its licensing a]ct are not explicit. Section 21(c)(8) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(c)(8). The construction of the [licensing a]ct given by the [licensing b]oard, as the one charged with its administration and execution, entitled it to great weight which should not be disregarded unless clearly erroneous. We may not invalidate the [licensing b]oard's interpretation of [its licensing a]ct unless it is found to be so unreasonable as to be an expression of whim instead of an exercise of judgment.

*Foose*, 578 A.2d at 1357 (citation omitted).

In the instant case, the Board's decision reveals that the Board examined the Act's good moral character requirement and its authorization to impose penalties on licensees convicted of crimes involving moral turpitude. The Board's decision also shows that the Board analyzed the elements of the crimes for which Garner was convicted. Based upon *Moretti* and its progeny, the Board determined that since Garner's crimes involved fraud and dishonesty, they constituted crimes of moral turpitude for which he was subject to discipline under Section 7(a)(5) of the Act.

In *Gombach v. Department of State, Bureau of Commissions, Elections & Legislation*, 692 A.2d 1127 (Pa. Cmwlth. 1997), this Court explained:

> Although good moral character was not defined by the General Assembly, . . . the phrase has been made constitutionally certain by our courts in terms of a person lacking 'moral turpitude.' Good moral character is defined, in part, as including 'an absence of proven conduct or acts which have been historically considered as manifestation of

---

[7] Thus, Garner's contentions that the District Attorney "would never make the [plea bargain] offer on a case involving alleged moral turpitude," and that his convictions resulted from his counsel's failure to object to certain jury instructions and from the victims' misunderstanding of his constable powers rather than him deceiving or misleading anyone, are irrelevant. *See* Garner Br. at 9, 14.

moral turpitude.' BLACK'S LAW DICTIONARY, 693 (6th ed.1990). Our courts have defined moral turpitude as 'anything done knowingly contrary to justice, honesty or good morals.' *Foose* . . . (quoting *Moretti* . . .). From these definitions it is apparent that the two phrases, good moral character and moral turpitude, are often used together or to define each other.

*Id.* at 1130. Pertaining to moral turpitude, the *Moretti* Court held:

> Unquestionably the most helpful definition yet offered was given in the case of *Jordan v. De George*, [341 U.S. 223, 232 (1951)], wherein it was stated:
>
>> Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that **crimes in which fraud was an ingredient have always been regarded as involving moral turpitude**. * * * Fraud is the touchstone by which this case should be judged. The phrase 'crime involving moral turpitude' has without exception been construed to embrace fraudulent conduct.

*Moretti*, 277 A.2d at 519 (emphasis added). This Court has also held:

> With respect to 'fraud,' a term not defined, Section 1903(a) of the Statutory Construction Act of 1972 advises that where a word is not defined in the statute but the word has acquired a peculiar and appropriate meaning, it shall be construed according to such peculiar and appropriate meaning for definition. 1 Pa.C.S. § 1903(a). 'Fraud' certainly has acquired a peculiar and appropriate meaning in the law. We turn to Black's Law Dictionary 594 (5th ed. 1979) for a definition and find one that is sufficiently simple and broad to answer our purpose: '[a]ny kind of artifice employed by one person to deceive another.'

*Chatham Racquet Club v. Commonwealth*, 561 A.2d 354, 357 (Pa. Cmwlth. 1989) (quoting *Commonwealth v. Nat'l Apartment Leasing Co.*, 529 A.2d 1157, 1160-61 (Pa. Cmwlth. 1987)). "Fraud" is defined in the Ninth Edition of *Black's Law*

5

*Dictionary* (2004) as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Id.* at 731.

Here, Garner was convicted for official oppression and impersonating a public servant. Section 5301 of the Crimes Code specifies as to official oppression:

> A person acting or purporting to act in an official capacity or **taking advantage of such actual or purported capacity** commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
>
> (1) **subjects another to** arrest, **detention, search, seizure**, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or
>
> (2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa.C.S. § 5301 (emphasis added). Relative to impersonating a public servant, Section 4912 of the Crimes Codes provides: "A person commits a misdemeanor of the second degree if he **falsely pretends** to hold a position in the public service with **intent to induce** another to submit to such **pretended** official authority or otherwise to act in reliance upon that **pretense** to his prejudice." 18 Pa.C.S. § 4912 (emphasis added). Because the elements of the crimes for which Garner was convicted clearly involve misrepresentation or concealment to induce others to act to their detriment, we hold that they include fraudulent conduct and, therefore, constitute crimes involving moral turpitude. Thus, the law supports the Board's determination that Garner's conviction was for crimes involving moral turpitude.

Garner also contends that CHRIA limits the Board's consideration to crimes related to the practice of optometry. We disagree. Section 7(a)(5) of the Optometry Act authorizes the Board to suspend Garner's license based on "a crime involving moral turpitude."[8] 63 P.S. § 244.7(a)(5). Section 9124(c) of CHRIA

_____

[8] Similarly, Section 23.62(e) of the Board's Regulations, 49 Pa. Code § 23.62(e), does not require that a licensee's conduct relate to his or her practice. Section 23.62(e) of the Board's

empowers a licensing board to suspend a license for misdemeanor convictions only when they relate to the licensed profession, as follows:

> **Boards**, commissions or departments of the Commonwealth authorized to license, certify, register or permit the practice of trades, occupations or professions may refuse to grant or renew, or **may suspend** or revoke **any license**, certificate, registration or permit **for the following causes**:
>
> (1) Where the applicant has been convicted of a felony.
>
> (2) **Where the applicant has been convicted of a misdemeanor which relates to the** trade, occupation or **profession for which the license**, certificate, registration or permit **is sought.**

18 Pa.C.S. § 9124(c) (emphasis added). Whether Section 9124(c) of CHRIA limits Section 7(a)(5) of the Optometry Act such that the Board may suspend Garner's license only if his misdemeanor crimes relate to the practice of optometry appears to be an issue of first impression.

However, Section 9124(c)(2) of CHRIA is inapplicable to this case. CHRIA's general purpose is to control the collection, maintenance, dissemination or receipt of criminal history record information. *See* 18 Pa.C.S. § 9103. Accordingly, "Section 9124(c) [of CHRIA] does not by its own terms grant authority to the Board to suspend or revoke [a professional] license." *Cannizzaro v. Dep't of State, Bureau of Prof'l & Occupational Affairs*, 564 A.2d 564, 567 (Pa. Cmwlth. 1989) (quoting *Gangewere v. Pennsylvania State Architects Licensure Bd.*, 512 A.2d 1301, 1305 (Pa. Cmwlth. 1986)). Historically, licensing boards have implicated either its licensing statute or CHRIA, or both, when sanctioning their members. Where a licensing statute does not specify that a licensee's conduct must be related to the licensed

Regulations states: "Licensed optometrists may not engage in unethical or illegal practices or conduct which fails to conform to the acceptable and prevailing standards of optometric practice, **or violates [s]tate** or [f]ederal **laws**." (Emphasis added).

7

profession, this Court has declined to impose such a requirement. *Vogelman v. State Bd. of Funeral Dirs.*, 550 A.2d 1367 (Pa. Cmwlth. 1988).

Here, the Board referenced in its Order to Show Cause that "[t]his action is brought pursuant to the [Optometry Act], 63 P.S. § 244.1 *et seq.*, and/or [CHRIA], 18 Pa.C.S. §§ 9101-9183." C.R. Item 1, Order to Show Cause at 1. The Board ultimately held that Garner "is subject to discipline of his license under [S]ection 7(a)(5) of the [Optometry] Act . . . in that [Garner] was convicted of a crime involving moral turpitude." Board Op. at 11. Because the Board did not rely upon Section 9124(c)(2) of CHRIA in Garner's case, but rather acted solely pursuant to its authority in Section 7(a)(5) of the Optometry Act, the crimes for which Garner was sanctioned were not required to be related to the practice of optometry.[9]

---

[9] Even if the Board had reviewed Garner's license under Section 9124(c)(2) of CHRIA, it does not appear that the Board's reliance upon a court's certified conviction documents to suspend Garner's license necessarily implicates CHRIA. CHRIA applies only to "[c]riminal history record information," which is defined as:

> Information collected by criminal justice agencies concerning individuals, and arising from the initiation of a criminal proceeding, consisting of identifiable descriptions, dates and notations of arrests, indictments, informations or other formal criminal charges and any dispositions arising therefrom. **The term does not include** intelligence information, investigative information or treatment information, including medical and psychological information, or **information and records specified in [S]ection 9104 (relating to scope)**.

18 Pa.C.S. § 9102 (emphasis added). Section 9104(a) of CHRIA states, in pertinent part:

> Except for the provisions of Subchapter B (relating to completeness and accuracy), Subchapter D (relating to security) and Subchapter F (relating to individual right of access and review), **nothing in this chapter shall be construed to apply to:**
>
> . . . .
>
> **(2) Any documents, records** or indices prepared or maintained by or **filed in any court of this Commonwealth**, including but not limited to the minor judiciary.

8

Lastly, Garner maintains that the Board abused its discretion by imposing a penalty that was too harsh, particularly since his license was inactive at the time of his crimes, and where the District Attorney (DA) felt that his crimes were "innocuous enough that the DA made a plea-bargain offer . . . ."[10] Garner Br. at 18. We disagree.

This Court has held that the professional license renewal requirement "neither serves as a statute of limitations nor requires the licensing agency to make a periodic determination of the licensee's qualifications."[11] *Gangewere*, 512 A.2d at 1306. Because the Board's reactivation process would not require a determination of Garner's specific qualifications to practice, he could merely pay a fee and submit proof of his continuing education to reactivate his license at any time. Thus, although Garner's license was inactive at the time of the crimes for which the Board sanctioned him, since Garner maintained a property interest in his license that he could revive at any time, the Board retained the jurisdiction and authority to suspend his license. *Nicoletti v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 706 A.2d 891 (Pa. Cmwlth. 1988); *see also Ullo v. State Bd. of Nurse Exam'rs*, 398 A.2d 764 (Pa. Cmwlth. 1979).[12]

---

18 Pa.C.S. § 9104(a) (emphasis added). Arguably, certified records of Garner's conviction from the Dauphin County Common Pleas Court do not constitute criminal history record information subject to CHRIA's limitations.

[10] Garner's counsel contended that the DA and the trial judge would have dismissed the charges if Garner had accepted the plea bargain which, *inter alia*, precluded him from running for public office for 15 years, but he refused to agree to such a condition. Reproduced Record, Notes of Testimony, March 21, 2013 at 85; *see also* Garner Br. at 9.

[11] Rather, "the purpose of periodic renewals of professional or occupational licenses is to raise revenues and to provide a current list of those people authorized to practice the profession or occupation within the Commonwealth[.]" *Gangewere*, 512 A.2d at 1306.

[12] Although *Gangewere*, *Nicoletti* and *Ullo* involved license renewals as opposed to license reactivations, we find the processes to be sufficiently similar to guide us under the instant circumstances.

Moreover, pursuant to Section 7(a)(5) of the Optometry Act, once Garner was convicted of a crime involving moral turpitude, the Board was authorized to sanction him. With complete independence from the DA's plea bargain, the Board was clearly authorized by the Optometry Act and what we refer to as the Licensing Boards and Commissions Law[13] with the discretion to fashion such penalties for Garner's misconduct.

> Section 7(b) of the Optometry Act provides:
>
> When the [B]oard finds that the license of a person may be refused, revoked or suspended the [B]oard may:
>
> (1) Refuse, revoke or **suspend a license**.
>
> (2) **Administer a public reprimand**.
>
> (3) Limit or otherwise restrict the licensee's practice under this act.
>
> (4) Suspend any enforcement under this subsection and place an optometrist on probation, with the right to vacate the probationary order and impose the enforcement.
>
> (5) Require a licensee to submit to the care, counseling or treatment of a physician or a psychologist designated by the board.
>
> (6) Restore or reissue, in its discretion, a suspended license to practice optometry and impose any disciplinary or corrective measure which it might originally have imposed.

63 P.S. § 244.7(b) (emphasis added). Section 8(c) of the Optometry Act, as amended by Section 5(b) of the Licensing Boards and Commissions Law, authorized the Board:

> In addition to the disciplinary powers and duties of the boards and commissions within the Bureau of Professional and Occupational Affairs under their respective practice

---

[13] Act of July 2, 1993, P.L. 345, *as amended*, 63 P.S. §§ 2201-2207.

acts, boards and commissions shall have the power, respectively:

. . . .

(4) **To levy a civil penalty of not more than $10,000[.00] per violation** on any licensee, registrant, certificate holder, permit holder or unlicensed person who violates any provision of the applicable licensing act or board regulation.

63 P.S. § 2205(b) (emphasis added).[14]  Further,

> [t]his Court may not substitute its own judgment for that of the Board and, absent a flagrant abuse of discretion, will not interfere in discretionary matters of the Board.  Our review of the record reveals that the Board's decision to suspend [and otherwise sanction Garner's] license was arrived at only after careful deliberation, is supported by the evidence in the record and is within the Board's authority.  We conclude, therefore, that the Board's action . . . was not an abuse of discretion.

*Gangewere*, 512 A.2d at 1306-07 (citation omitted).

Based on the foregoing, the Board's order is affirmed.


_____
ANNE E. COVEY, Judge

---

[14] Section 8(c) of the Optometry Act, 63 P.S. § 244.8(c), was repealed insofar as it was inconsistent with Section 5 of the Licensing Boards and Commissions Law, which was amended by Section 1 of the Act of July 17, 2009, P.L. 95, *as amended*, 63 P.S. § 2205 (effective for violations that occurred after September 15, 2009).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. J.C. Garner, O.D.,                    :
                    Petitioner            :
        v.                                :
                                          :
Bureau of Professional and                :
Occupational Affairs, State               :
Board of Optometry,                       :        No. 1938 C.D. 2013
                    Respondent            :

ORDER

AND NOW, this 30th day of July, 2014, the Department of State, Bureau of Professional and Occupational Affairs, State Board of Optometry's September 26, 2013 final adjudication and order is affirmed.

_____
ANNE E. COVEY, Judge