IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| David Andrew King, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 68 C.D. 2017 |
| | : | Submitted: February 7, 2018 |
| Bureau of Professional and | : | |
| Occupational Affairs, State | : | |
| Board of Barber Examiners, | : | |
| | : | |
| Respondent | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE ROBERT SIMPSON, Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY JUDGE WOJCIK                              FILED:  October 4, 2018


David Andrew King (King) petitions for review of the December 23, 2016 final adjudication and order of the Bureau of Professional and Occupational Affairs, State Board of Barber Examiners (Board) revoking King's licenses to practice as a barber, barber manager, and barber teacher.  For the reasons that follow, we reverse.

King was issued a license to practice as a barber in Pennsylvania on March 27, 1986.  Reproduced Record (R.R.) at 98a.  He was issued a license to practice as a barber manager in Pennsylvania on April 21, 1998.  *Id.*

On May 10, 2007, King was found guilty of one count of involuntary deviate sexual intercourse with a person less than 13 years of age, in violation of what was then Section 3123(a)(6) of the Crimes Code, 18 Pa. C.S. §3123(a)(6), a first-degree felony.[1]  R.R. at 10a-11a.  King also was found guilty of one count of indecent assault of a person under 13, one count of indecent exposure, and two counts of corruption of minors, all of which are first-degree misdemeanors.  The convictions were based on conduct that occurred on three occasions, between approximately 1998 and 2001, when the victim was between seven and ten years old.[2]  R.R. at 10a-11a, 35a.

King was sentenced to 5 to 10 years of incarceration at a state correctional institution, plus 10 years of probation.  The court attached the following conditions to his sentence: lifetime sex offender registration, pursuant to *former* Section 9795.1(b) of what was commonly referred to as Megan's Law III, 42 Pa. C.S. §9795.1(b);[3] a prohibition from being unsupervised around girls under the age of 18; and a requirement that King undergo sex offender evaluation and any recommended treatment, including pharmacological intervention and periodic polygraph testing.  Additional conditions required that King: have limited internet connection to prevent access to child pornography; take STD classes;[4] perform

---

[1] A violation for involuntary deviate sexual intercourse with a child less than 13 years of age would now be charged under Section 3123(b) of the Crimes Code, 18 Pa. C.S. §3123(b).

[2] The victim was King's stepdaughter.  The abuse was reported on September 2, 2005, when the victim was 14 years old, after the girl's mother discovered the information in her daughter's diary.  King was charged on October 10, 2005.  R.R. at 27a.

[3] In 2011, the General Assembly replaced Megan's Law III with the Sex Offender Registration and Notification Act (SORNA), 42 Pa. C.S. §§9799.10 - 9799.75, effective December 20, 2012.

[4] The record does not indicate what STD stands for.

2

community service; undergo individual counseling or psychiatric treatments as recommended; maintain family responsibilities; and maintain full-time employment. R.R. at 30a-32a.

On July 1, 2008, while incarcerated, King earned his Board-issued barber teacher license. R.R. at 76a-78a. King was released on parole on May 12, 2012. One of the conditions of his parole is that he remain gainfully employed. R.R. at 52a. Within 30 days after his parole release, in June 2012, King was hired by World A Cuts Barber Institute (World A Cuts) in York as an instructor. R.R. at 65a, 76a.

On January 20, 2016, the Board issued an order to show cause, based upon King's 2007 felony conviction, why the Board should not suspend, revoke, or otherwise restrict King's barber licenses, impose a civil penalty, or impose the costs of investigation. R.R. at 1a-6a. The Board's action was brought under Section 9124(c) of the Criminal History Record Information Act (CHRIA), 18 Pa. C.S. §9124(c), which authorizes the Board to "suspend or revoke any license . . . [w]here the applicant has been convicted of a felony." On February 22, 2016, King filed an answer with new matter and a request for a hearing to present evidence in mitigation of any penalty the Board might impose. R.R. at 37a-38a.

A Board Hearing Examiner conducted a hearing on May 18, 2016. The Commonwealth presented certified criminal records of King's conviction, the Board's order to show cause, and King's answer. King testified and offered the testimony of two additional witnesses.

Michael Welsh, King's parole officer, testified on King's behalf. Welsh has worked for the Pennsylvania Board of Probation and Parole for nine years and is assigned to the Sex Offender Unit. He currently supervises a caseload of 110

3

sex offenders, including King. Welsh testified that he has been King's parole agent since May 12, 2012, and he described King as one of the most compliant offenders under his charge. Welsh explained that being gainfully employed is a condition of King's probation. Additional conditions of King's parole include maintaining weekly participation with Commonwealth Clinical Group, a sex offender treatment program; refraining from the use of drugs and alcohol; and having no contact with the victim or her family. Welsh said he meets with King's counselor and the assistant director at Commonwealth Clinical Group every two weeks and that King is considered a model group attendee. R.R. at 51a-54a.

Patrick Winter, the owner of World A Cuts, testified that the barber school prepares students to meet the state board licensing requirements. He stated that he and the institute's manager reviewed King's application, which reflected his criminal history. He said they met with King twice and discussed the charges with him, and King asked them to give him a chance to be employed. R.R. at 64a-65a.

Winter testified that he hired King in June 2012 and that King has been a good employee. He said that King travels about an hour and a half to get to work each day and has never been late. Winter described King as honest, dedicated, and reliable, adding that King handles significant amounts of cash and manages student tuition and student aid. Winter also said that he gave King a key and a security code because he sometimes relies on King to open and close the business. R.R. at 65a-67a. Winter testified that King's duties as an instructor include classroom instruction and floor supervision of the school's students, who are male and female students age 18 and older. He noted that the barber school students service walk-in customers, some of whom may be under 18 and accompanied by parents. Winter

4

also noted that, with the exception of the bathrooms, the entire school is under 24-hour ADT Security surveillance.[5]  R.R. at 66a-68a.

Winter stated that King is highly qualified, very reliable, a very good teacher, and a valuable employee.  He stated that King's criminal conviction does not affect his ability to perform his barber instructor duties and that World A Cuts' business would suffer without him.  R.R. at 68a-71a.

King testified that he had been employed at World A Cuts since June 2012.  He added that he obtained his barber license in 1985 and has worked as a barber since the age of 18.  King explained that, while he was incarcerated, the Department of Corrections afforded him the opportunity to obtain his barber teaching license.  R.R. at 76a-78a.

King described his duties at World A Cuts as including theory instruction with textbooks and workbooks and practical instruction with walk-in clients who come in for haircuts.  R.R. at 79a.

The Hearing Examiner questioned King about the incidents underlying his criminal charges.  The Hearing Examiner specifically noted that King had committed a sexual offense against a minor with whom he had a trusting relationship, and he asked King to comment on those circumstances as they relate to the trust placed in him as an instructor at the barber school.  King acknowledged that the three incidents occurred over a period of three years and that the victim was a member of his household and someone with whom he had a trusting relationship.  He stated that, at the time, he was $100,000 in debt and under a lot of stress; he described himself as being "in a sick place."  R.R. at 85a.  He said that he just

_____

[5] The Hearing Examiner asked King if the school's unmonitored bathroom area would pose a problem for him.  King said no and noted that the cameras capture everyone who enters and leaves the bathroom.  R.R. at 27a, 89a.

5

snapped, adding that he should have sought therapy. King testified that he had learned a lot about himself since then. He stated that while he was incarcerated, he participated in eight months of low intensity therapy, after which he volunteered to participate in months of high intensity therapy, for a total of 20 to 24 months of treatment. R.R. at 84a-87a.

The Hearing Examiner observed that King lives with his mother, is not able to support himself as he once did, and would always have different types of stress in his life. The Hearing Examiner asked King to address how he is better prepared now to handle stress than he was before. King stated that he has learned to identify things to avoid, such as being alone with a minor, and to leave that situation and ask for help. R.R. at 87a. He also confirmed that since he began his employment with World A Cuts, he has never been alone with a minor at work. He explained that students are always present and that minor customers are usually accompanied by their parents. King concluded by stating that if his licenses are revoked, he could no longer work at World A Cuts, and it could take months for him to find gainful employment, which would render him in violation of his parole conditions.

On September 1, 2016, the Hearing Examiner issued a proposed adjudication and order. Certified Record (C.R.) Item 7. After concluding that the Board proved that King is subject to discipline under CHRIA, the Hearing Examiner determined that the "only question remaining is the sanction to be imposed." C.R. Item 7 at 12. She first noted that "[t]he Board has a duty to protect the health and safety of the public." *Id.* She further noted that "[u]nder professional licensing statutes, including the Barber License Law,[6][] the Board is charged with the responsibility and authority to oversee the profession and to regulate and license

---

[6] Act of June 19, 1931, P.L. 589, *as amended*, 63 P.S. §§551-567.

6

professionals to protect the public health and safety. For these reasons, the Board *may* impose disciplinary action." *Id.* (footnote omitted) (citation omitted).

The Hearing Examiner then determined that King had provided substantial mitigation against any sanction, citing his rehabilitation efforts and his educational achievements since 2007. She specifically "gave substantial weight to the fact that the underlying incidents resulting in [King's] convictions occurred approximately 15-20 years ago, that [he] successfully completed his barber teacher education during his incarceration, and that [he] participated in treatment and support group programs during and after his incarceration." C.R. Item 7 at 12. Finally, the Hearing Examiner noted that King had been gainfully employed at World A Cuts as a barber teacher for the past four years, that he had no parole violations, and that he had "maintained an unblemished reputation in his community since his release on parole in 2012." *Id.*

Based on those facts, she determined that "[t]here are no established facts indicating that the public needs protection from [King], that [King] is a threat, or that [King] requires monitoring by the Board in order to deter any future violations." C.R. Item 7 at 12-13. She concluded that, "[g]iven all of the circumstances, none of the bases for imposing a sanction is at all compelling." *Id.* at 13. She noted that King has been a licensed barber for over 30 years, has had no prior disciplinary actions before the Board, received his barber teacher license in 2008 while incarcerated and has been gainfully employed for the past four years as a barber instructor without incident. Emphasizing that King has been actively participating in his rehabilitation for several years, the Hearing Examiner stated that "the criminal offense at issue in this case is too remote in time to support imposing a sanction upon [him] at this point." *Id.* Consequently, the Hearing Examiner

7

concluded that King is subject to disciplinary action under Section 9124(c)(1) of the CHRIA, but she recommended that no disciplinary sanctions be imposed. C.R. Item 7.

Attached to the Hearing Examiner's September 1, 2016 proposed report was a notice explaining the parties' right to file a brief on exceptions and noting that a failure to file a brief on exceptions within 30 days[7] "shall constitute a waiver of all objections" to the proposed adjudication. C.R. Item 7. On September 14, 2016, the Board issued a notice of its intent to review the Hearing Examiner's proposed adjudication. C.R. Item 8. The notice informed the parties that the Board could substitute its own findings for those of the Hearing Examiner and impose a greater or lesser sanction. C.R. Item 8 at 1. Neither King nor the Commonwealth filed a brief on exceptions.

The Board considered the entire record in this matter at its regularly scheduled meeting on October 17, 2016. On December 23, 2016, the Board issued a final adjudication and order that revoked King's licenses as a barber, barber manager, and barber teacher, effective January 23, 2017. R.R. at 95a-110a. The Board explained that in imposing these sanctions, it considered its duty to protect the citizens of the Commonwealth and the severity of King's criminal charge and concluded that King's evidence was not sufficient to establish that he does not pose a risk to potential minor students or clients. R.R. at 106a-107a.

King now appeals to this Court. He argues that the Board abused its discretion and acted in an arbitrary and capricious manner by concluding that license revocation was an appropriate sanction for his criminal conviction, where the conduct leading to his conviction occurred 15 to 20 years ago, his criminal conduct

---

[7] 1 Pa. Code §35.211.

8

bears no relationship to his job as a Board-licensed barber instructor, the Board issued his instructor license after his conviction, and the Board's disciplinary action was brought nine years later. We agree.[8]

Citing *Secretary of Revenue v. John's Vending Corporation*, 309 A.2d 358 (Pa. 1973), King argues that, in evaluating whether a licensing board's sanction reflects an abuse of discretion, Pennsylvania courts must consider whether the sanction imposed is reasonably related to a legitimate state purpose. In that case, the Secretary of Revenue revoked a corporation's wholesale cigarette license on July 14, 1971, in accordance with former Section 403 of the Cigarette Tax Act.[9] The

---

[8] On January 20, 2017, King filed an application for supersedeas seeking to stay the revocation and continue his employment (and thereby remain in compliance with his parole conditions) pending his appeal to this Court. The Board opposed King's request. In granting King a supersedeas on appeal, we explained:

> Based on our review of this action, we believe that [King] is entitled to a supersedeas of the Board's revocation order pending this Court's disposition of the underlying petition for review. Admittedly, [King] was convicted of a heinous and shocking crime; however, given the nature of the crime, the length of time that has elapsed between [King]'s conviction and the license revocation, as well as the lack of any further offenses we do not believe [King] is a serious risk to the students he instructs. *That [King] may, at some point during this appeal, be faced with either teaching or barbering a minor is purely speculative.* It does not appear this contingency has occurred during the time [King] has been an instructor. Finally, in light of the harm [King], a convicted offender who is seemingly working towards continued rehabilitation, may face if he cannot perform his trade during the appeal proceedings, we conclude a supersedeas is warranted.

1/31/17 Memorandum and Order at 3 (emphasis added).

[9] Act of July 8, 1957, P.L. 594, *as amended*, *formerly* 72 P.S. §3168.403, repealed by the Act of July 22, 1970, P.L. 513. In relevant part, former Section 403 required that the applicant for a wholesale cigarette dealer's license, or any officer, director, or shareholder controlling more than 50% of the stock, if the applicant is a corporation, "shall not have been convicted of any crime involving moral turpitude." *Former* 72 P.S. §3168.403

9

revocation was based on 50% shareholder Robert Martorano's convictions for crimes of moral turpitude (*i.e.*, possessing and selling untaxed liquor and possessing and selling opium derivatives), in the early 1950s. Commonwealth Court affirmed the license revocation. However, on further appeal, our Supreme Court reversed. The court explained:

> At the outset, it should be noted that every citizen has an inalienable right to engage in lawful employment. While a state may regulate a business which affects the public health, safety and welfare, it may not, through regulation, deprive an individual of his right to conduct a lawful business unless it can be shown that such deprivation is reasonably related to the state interest sought to be protected. *See*, *Dent v. West Virginia*, 129 U.S. 114 (1889); *Moore v. Jamieson*, 306 A.2d 283 [(Pa. 1973)].

309 A.2d at 361. The court observed that at the time Martorano was president of the corporation, the statutory prohibition had not yet been enacted, and that during the years of Martorano's employment with the corporation, there was no suggestion of impropriety concerning his conduct.

The Supreme Court concluded in *John's Vending* that while it was reasonable to consider the character of persons being licensed, the facts established that there was no material relevance between the applicant's past crimes and his present ability to perform the duties required by the position. Noting that the crimes had occurred almost 20 years earlier, the court reasoned as follows:

> A provision in the nature of Section 403(2) at best only suggests that a person who has committed certain acts in the past would be more likely to betray the trust that this license entails than a citizen with no such past history. Such reasoning, while not infallible, has a logical basis in experience. But that basis exists only where those events occurred so recently that the particular character trait of the individual involved can reasonably be assumed to have

10

remained unchanged. Where, as here, nearly twenty years has expired since the convictions and the record reveals that the individual has held this position of responsibility for twelve years without any allegation of impropriety, it is ludicrous to contend that these prior acts provide any basis to evaluate his present character.

In order to avoid an absurd and harsh result, a court may look beyond the strict letter of the law to interpret a statute according to its reason and spirit and accomplish the object intended by the legislature. *To interpret Section 403(2) as a blanket prohibition barring anyone who has been convicted of a crime of moral turpitude without regard to the remoteness of those convictions or the individual's subsequent performance would be unreasonable. We cannot assume that the legislature intended such an absurd and harsh result.*

*Id.* at 362 (emphasis added) (citations omitted).

The court further concluded that such a result would be inconsistent with the state's commitment to rehabilitation of persons who have been convicted of criminal offenses. "To forever foreclose a permissible means of gainful employment because of an improvident act in the distant past completely loses sight of any concept of forgiveness for prior errant behavior and adds yet another stumbling block along the difficult road of rehabilitation." *Id.*

King also relies upon *Ake v. Bureau of Professional & Occupational Affairs*, 974 A.2d 514 (Pa. Cmwlth. 2009), in which the State Board of Accountancy (Accountancy Board) relied on Kevin Ake's (Ake) unreported felony hate crime conviction, which occurred in Illinois seven years earlier, to revoke his certified public accountant's (CPA) credentials. The Accountancy Board reasoned that a revocation of Ake's CPA license would eliminate the risk of harm to those for whom he might work in Pennsylvania; deter other CPAs from committing felonious acts outside the state; and assure the public that only individuals of good moral character

11

are permitted to practice as CPAs in Pennsylvania. The Accountancy Board rejected Ake's plea for leniency, based in part on his need for CPA credentials to practice his profession and to maintain gainful employment, and was not persuaded by Ake's mitigation evidence. Ake appealed, asserting that the Accountancy Board abused its discretion by imposing the maximum penalty allowed by law. This Court agreed.

We first noted that the licensing board "exercises considerable discretion in policing its licenses." 974 A.2d at 519. However, citing the Supreme Court's decision in *John's Vending*, we recognized that this Court has a duty "to correct abuses of discretion in manner or degree of penalties imposed." *Id.* We vacated the Accountancy Board's decision and remanded for the imposition of a lesser sanction, explaining:

> *John's Vending teaches that the nature of the offending conduct and its remoteness in time must be considered where an agency seeks to revoke a professional license on the basis of a conviction.* In this case, nearly seven years elapsed between Ake's offending conduct and his application to reactivate his Pennsylvania CPA credentials. While not as long as the twenty years in *John's Vending*, seven years is a substantial interval of time. Moreover, Ake's conduct was isolated to calls made over a two-week period; he has not engaged in similar conduct since his arrest. . . .
>
> [I]t is apparent that the General Assembly drafted the disciplinary provisions of [Section 1 of] the CPA Law[10] with an eye toward ferreting out the types of misconduct that are anathema to the accounting profession. For example, among the other grounds for discipline are fraud or deceit in obtaining a CPA certificate; dishonesty, fraud or gross negligence in the practice of accounting; conviction of any crime involving dishonesty or fraud; and

---

[10] Act of May 26, 1947, P.L. 318, *as amended*, added by Section 7 of the Act of September 2, 1961, P.L. 1165, 63 P.S. §9.9a.

12

> violation of any federal or state revenue law. . . . Ake's harassing conduct in Illinois was certainly deplorable. However, it does not relate to any of the character qualities the legislature has identified as central to holding a CPA certificate, *i.e.*, honesty, integrity and being able to practice accounting in a non-negligent manner.

*Ake*, 974 A.2d at 520 (emphasis added).

Of course, *John's Vending* and *Ake* are distinguishable from the present matter, both in the licensing statutes at issue and in the more egregious nature of King's criminal conduct. To be sure, conduct such as harassing phone calls (*Ake*) and possessing and selling untaxed liquor and opium derivatives (*John's Vending*) pales in comparison to sexual abuse of a minor child. Nevertheless, the principles enunciated in those decisions apply equally here, where the Board's decision would "foreclose a permissible means of gainful employment" that is essential to King's success while on parole. It remains true that "every citizen has an inalienable right to engage in lawful employment," and state regulation that deprives an individual of his right to pursue his lawful occupation "must show that the deprivation is reasonably related to the state interest sought to be protected." *John's Vending*, 309 A.2d at 361.

> We also recognize that

> [t]he ultimate decision on what, if any, action to take lies with the [b]oard; the [b]oard may hold an additional hearing, may make new findings of fact, may alter the sanctions recommended, may reject the proposed report in its entirety, or may adopt the Hearing Examiner's proposed report and order without alteration.

*Hammad v. Bureau of Professional & Occupational Affairs, State Board of Veterinary Medicine*, 124 A.3d 374, 381 (Pa. Cmwlth. 2015).

13

In this instance, the Board's findings differ significantly from those of the Hearing Examiner.[11] While the Hearing Examiner issued numerous findings addressing King's "rehabilitation since the 2007 criminal conviction," (Hearing Examiner's Findings of Fact Nos. 9-22), the Board's findings include only a passing reference to the evidence of mitigation offered on King's behalf. Board's Finding of Fact No. 32.[12] The Board did not reject King's mitigation evidence as not credible.

Moreover, whereas the Hearing Examiner focused on whether a disciplinary sanction was appropriate, the Board determined that the predominant issue before it was "whether [King] can be trusted around young students or minor clients." Board's decision at 10. In reaching its decision, the Board reasoned:

> In consideration of the severity of [King's] conviction, the Board notes that it involved forced sexual acts on a girl who was not only a minor but also [King's] step-daughter and the fact that *it spanned over several years* from when the victim was between the ages of seven and ten. The Board would point out that [King] kept his sexual assaults against his step-daughter a secret for another three or four years . . . [until] the then fourteen-year-old victim [came] forward and report[ed] the sexual assault she experienced *throughout her childhood* at the hands of [King].

---

[11] The Board included more details of the three incidents underlying King's convictions. The Board also mischaracterized the testimony of witnesses in some instances, for example, finding that minors "are often present" in the barbershop, citing testimony that customers include "a child from time to time." Board's Finding of Fact No. 29; Notes of Testimony (N.T.) at 30. The Board noted that King's criminal conduct occurred on three occasions yet later stated that King's misconduct "spanned several years," and that the victim "experienced [sexual assault] throughout her childhood." Board's decision at 11.

[12] In its entirety, the Board's Finding of Fact No. 32 states: "[King] testified on his own behalf and presented the testimony of two witnesses: Agent Michael Welsh, who has been supervising [King] on parole for four (4) months and Patrick Winter, [King's] employer at World A Cuts, Incorporated. (N.T. 13-52)." The Board briefly addressed that testimony in its analysis.

14

The Board has a duty to protect the health and safety of the citizens of this Commonwealth. Section 3 of [what is commonly referred to as] the Barber's License Law[13] requires that prior to taking the barber's examination, the applicant shall be at least sixteen years of age. Despite [King] and his employer's testimony that there are only two females currently enrolled at the institute, that the students are not minors and that there is surveillance in the building, the Board does not find this mitigating testimony sufficient to conclude that [King] does not pose a risk to the young students and minor clients. A sixteen or seventeen-year-old female student *could be enrolled* at the institute at any time in the future. Furthermore, the clients who are coming into the barbershop *could quite often* be minor females whose parents may not accompany the minor while in the barber chair.

In determining a sanction for [King's] barber licenses, the Board considers the severity of [King's] criminal charge, the fact that [King] *could potentially be an instructor to female students under the age of eighteen in violation of his sentencing conditions*,[14] the fact that minor clients *are often present* in the barbershop and the fact that [King] is scheduled to be under supervised release for at least another five (5) years. The Board also takes notice of the fact that [King] victimized his own step-daughter, who presumably trusted [King] to take care of her needs. After

---

[13] Act of June 19, 1931, P.L. 589, *as amended*, 63 P.S. §553. Section 3(a) of the Barber's License Law provides, in relevant part:

> Each applicant for a barber's license shall, as a condition precedent to obtaining a license, take the barber's license examination and score a passing grade. Prior to taking the examination the applicant shall be at least sixteen years of age, have completed the eighth grade or its equivalent and have completed a barbering study and training period of at least one thousand two hundred fifty (1250) hours and not less than nine months either in a licensed barber school under the instruction of a licensed teacher, or in a licensed barber shop under the instruction of a licensed teacher.

63 P.S. §553(a).

[14] The sentencing conditions prohibit unsupervised contact with minor females, not any contact whatsoever, as the Board implies.

> considering the evidentiary record of this case, the Board finds that the seriousness of [King's] criminal offense, for which he blamed on occurring because he was under a lot of stress [sic], far outweighs the modest evidence of mitigation. In order to protect the public health and safety, as well as to deter future transgressions by [King] and other licensees, the Board revokes [King's] license[s] to practice as a barber, barber manager, and barber teacher.

Board's adjudication at 10-11, R.R. at 106a-107a (emphasis added). The Board made no reference to the fact that the conduct underlying King's convictions occurred approximately 15-20 years earlier, or to his rehabilitation efforts since 2007, or his gainful employment for the past four years.

There is no question that Section 9124(c)(1) of CHRIA authorizes the Board to revoke King's barber licenses based solely on his felony conviction. Indeed, this Court has made clear that Section 9124(c) of CHRIA permits the Board to revoke a professional license based on the licensee's conviction of a felony, "with no requirement that the crime relate to the profession in question." *Fulton v. Bureau of Prof'l & Occupational Affairs*, *State Bd. of Barber Exam'rs,* 169 A.3d 718, 725 (Pa. Cmwlth. 2017). The Board's authority to revoke a license under CHRIA is in addition to the Board's authority to impose discipline under the Barber Licensing Law; even where the felony does not fall within the conduct regulated by the licensing statute, "conviction of a felony is [itself] a sufficient ground for license revocation."[15]    *Id.*    Moreover, this Court's standard of review of disciplinary

---

[15] We note that King was released from prison in May of 2012, five years after his sentencing on May 10, 2007. Had King's licenses been revoked in 2007, CHRIA would not authorize the Board to deny his application for reinstatement in 2012 based on his conviction, absent any showing that the convictions were related to his barbering work. Section 9124(b)(5) of CHRIA, 18 Pa. C.S. §9124(b)(5); *Fulton v. Bureau of Prof'l & Occupational Affairs*, 169 A.3d 718, 725 (Pa. Cmwlth. 2017).

16

decisions by a professional board is extremely deferential. *Kirkpatrick v. Bureau of Prof'l & Occupational Affairs, State Bd. of Barber Exam'rs*, 117 A.3d 1286, 1290 (Pa. Cmwlth. 2015).[16]

Nevertheless, with regard to the penalties the Board elects to impose upon a licensee for a felony under CHRIA, Commonwealth Court may review the Board's action for an abuse of discretion. *Nguyen v. Pennsylvania State Bd. of Cosmetology*, 53 A.3d 100, 105 n.6 (Pa. Cmwlth. 2012). Indeed, "this Court is required to correct abuses of discretion in manner or degree of penalties imposed." *Ake*, 974 A.2d at 519 (quoting *Foose v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 578 A.2d 1355, 1359 (Pa. Cmwlth. 1990)). *See also Bentley v. Bureau of Prof'l and Occupational Affairs, State Bd. of Cosmetology*, 179 A.3d 1196, 1200 n.3 (Pa. Cmwlth. 2018).

The Board's decision emphasized its duty to protect prospective minor patrons of a barber shop. Consequently, in our review for abuse of discretion, it is appropriate to consider the relevant statutory provisions that were adopted by the General Assembly for the specific purpose of protecting barber shop patrons. *See*

---

[16] In *Kirkpatrick* we stated:

> [I]t has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.

*Kirkpatrick,* 117 A.3d at 1290 n.10 (quoting *Blumenschein v. Hous. Auth. of Pittsburgh*, 109 A.2d 331, 334-35 (Pa. 1954) (emphasis omitted)).

*Dep't of Licenses & Inspections v. Weber*, 147 A.2d 326, 328 (Pa. 1959) (the Barber License Law has but one purpose, which is the protection of patrons).

In reviewing the Barber License Law, we note that this statute does not prohibit licensure based on a prior conviction of any kind, nor does it require that applicants demonstrate that they are of good moral character. 63 P.S. §553; *Fulton*, 169 A.3d at 722-23. Instead, the Barber License Law requires only that applicants be at least 16 years old, have at least an eighth-grade education, have a specified amount of training and experience, and pass the applicable examinations. 63 P.S. §553. The provisions of the Barber License Law stand in sharp contrast to licensure statutes for other occupations, including architects, cosmetologists, funeral directors, poultry technicians, and veterinarians, which specifically require applicants and licensees to possess good moral character and permit discipline or the denial of licensure based on convictions of crimes of moral turpitude or a felony.[17] *Fulton*, 169 A.3d at 723.

---

[17] Compare statutes governing licensure of the following professions and occupations: architects, Section 19(a)(7) of the Architects Licensure Law, Act of December 14, 1982, P.L. 1227, *as amended*, 63 P.S. §34.19(7); mortgage brokers, Section 6133(d)(1) of the Mortgage Licensing Act, 7 Pa. C.S. §6133(d)(1); cosmetologists, Section 4 of the Beauty Culture Law, Act of May 3, 1933, P.L. 242, *as amended*, 63 P.S. §510; accountants, Section 4.2(b)(2) of the CPA Law, Act of May 26, 1947, P.L. 318, *as amended*, added by the Act of July 9, 2008, P.L. 954, 63 P.S. §9.4b(b); dentists and dental hygienists, Section 4.1(a)(4) of the Dental Law, Act of May 1, 1933, P.L. 216, *as amended*, added by the Act of December 20, 1985, P.L. 513, 63 P.S. §123.1(a)(4); funeral directors, Section 11 of the Funeral Directors Law, Act of January 14, 1952, P.L. (1951) 1898, *as amended*, 63 P.S. §479.11; landscape architects, Section 6(b) of the Landscape Architects Registration Law, Act of January 24, 1966, P.L (1955) 1527, *as amended*, 63 P.S. §906(b); massage therapists, Section 5 of the Massage Therapy Law, Act of October 9, 2008, P.L. 1438, *as amended*, 63 P.S. §627.5; motor vehicle dealers, Section 10 of the Board of Vehicles Act, Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. §818.19; nurses, Section 6(a) and (c) of the Professional Nursing Law, Act of May 22, 1951, P.L. 317, *as amended*, 63 P.S. §216(a), (c); optometrists, Section 7 of the Optometric Practice and Licensure Act, Act of June 6, 1980, P.L. 57, *as amended*, 63 P.S. §277.7; pharmacists, Section 3(a) of the Pharmacy Act, Act of September

Notably, the Barber License Law contains no such prohibitions. In fact,

> consistent with the absence in the Barber License Law of character and criminal history restrictions, the Department of Corrections (DOC) has established a barber and barber manager training program for inmates serving substantial prison sentences to allow such inmates to learn the vocational skill of barbering and obtain a license to practice that vocation.

*Fulton*, 169 A.3d at 723-24. Indeed, *all but one of the state's 25 correctional institutions* offers vocational instruction leading to licensure in the field of barbering.[18]

However, and as evidenced by the record here, the legislature has enacted other statutes that are expressly intended to address the Board's stated concerns. Specifically, by way of the Prisons and Parole Code, 61 Pa. C.S. §§101-6309, the General Assembly has vested exclusive authority and broad discretion to the Board of Probation and Parole to determine if and when a prisoner should be released on parole. *McGill v. Dep't of Health, Office of Drug and Alcohol Programs*, 758 A.2d 268, 271 (Pa. Cmwlth. 2000). Section 6102 of the Prisons and Parole Code provides:

---

27, 1961, P.L. 1700, *as amended*, 63 P.S. §390-3(a); poultry technicians, Section 2 of the Act of April 6, 1956, P.L. (1955) 1429, *as amended*, 63 P.S. §644; respiratory therapists and athletic trainers, Section 22(b) of the Medical Practice Act of 1985, Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. §422.22(b); physical therapists, Section 6 of the Physical Therapy Practice Act, Act of October 10, 1975, P.L. 383, *as amended*, 63 P.S. §1306; and veterinarians, Section 21(15) of the Veterinary Medicine Practice Act, Act of December 27, 1974, P.L. 995, *as amended*, 63 P.S. §485.21(15).

[18] *See* Pennsylvania Department of Corrections website at https://www.cor.pa.gov/Inmates/Documents/Education%20and%20Vocation%20Documents/Vocational%20Programs%20by%20Facility.pdf (last visited August 28, 2018).

The parole system shall operate consistently with the following provisions:

(1) The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.

(2) In providing these benefits to the criminal justice system, *the board and any other paroling entity shall first and foremost seek to protect the safety of the public*.

61 Pa. C.S. §6102 (emphasis added). In *Barge v. Pennsylvania Bd. of Probation and Parole*, 39 A.3d 530 (Pa. Cmwlth. 2012), we held that the board did not violate its statutory duties by paroling sex offenders but failing to release them to community corrections centers. In doing so, we emphasized that "the Board's overriding legislative duty is to protect the safety of the public." *Id.* at 546.

The General Assembly also has enacted lifetime sex offender registration statutes, *i.e.*, what is commonly referred to as Megan's Law III[19] and, later, the Sex Offender Registration and Notification Act (SORNA), for the public's protection. The Pennsylvania Supreme Court stated that Megan's Law III, which was in effect when King was convicted, "[s]erve[d] a vital purpose *in protecting our Commonwealth[']s citizens and children, in particular, from victimization by sexual predators*." *Commonwealth v. Neiman*, 84 A.3d 603, 615 (Pa. 2013) (emphasis added). Now-effective Section 9799.11(a) of SORNA similarly provides, in relevant part, that since "[s]exual offenders pose a high risk of committing additional sexual offenses[,] protection of the public from [a sexual] offender is a paramount

---

[19] 42 Pa. C.S. §9795.1(b).

governmental interest." 42 Pa. C.S. §9799.11(a)(4).[20] To that end, Section 9799.11(a)(7) of SORNA reflects that "[k]nowledge of whether a person is a sexual offender could be a significant factor in protecting oneself and one's family members . . . from recidivist acts by such offenders." 42 Pa. C.S. §9799.11(a)(7). The General Assembly further declared in Section 9799.11(b) of SORNA:

> (1) It is the intention of the General Assembly . . . to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

> (2) It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and shall not be construed as punitive.

42 Pa. C.S. §9799.11(b). Accordingly, pursuant to Section 9799.16(b) of SORNA, the Pennsylvania State Police (PSP) maintains a shared registry under which King was required to provide his name (including aliases and internet monikers), date of birth, address, telephone number, social security number, motor vehicle information, plus his "[n]ame and address where [he] is employed or will be employed. . . . [and] [i]nformation relating to [his] occupational and professional licensing, including type of license held and the license number." 42 Pa. C.S. §9799.16(b)(9), (10).

---

[20] In *Taylor v. Pennsylvania State Police*, 132 A.3d 590 (Pa. Cmwlth. 2016), this Court determined that a petitioner should have the opportunity to prove that SORNA's presumption is not universally true. Accordingly, while recidivism was certainly part of the General Assembly's reasoning for the provision, Section 9799.11(a)(4) of SORNA is no longer considered to be an irrebuttable presumption.

21

Conspicuously absent from these statutes are any prohibitions related to employment. But that gap is filled by additional statutory safeguards provided elsewhere, and in particular, by the Child Protective Services Law (CPSL), 23 Pa. C.S. §§6301-6386. Sections 6344 – 6344.4 of the CPSL, 23 Pa. C.S. §§6344 – 6344.4, apply to persons who, in their employment or participation in volunteer activities, have "direct contact with children." 23 Pa. C.S. §6344. The CPSL defines "direct contact with children" as the "care, supervision, guidance or control of children or routine interaction with children." 23 Pa. C.S. §6303(a). "Routine interaction" is defined as "*[r]egular and repeated contact that is integral to a person's employment* or volunteer responsibilities." *Id.* (emphasis added).

While the above statutes have the explicit purpose of providing for public safety, "CHRIA's general purpose is to control the collection, maintenance, dissemination or receipt of criminal history record information." *Garner v. Bureau of Prof'l and Occupational Affairs, State Bd. of Optometry*, 97 A.3d 437, 442 (Pa. Cmwlth. 2014).[21] Section 9124(c) of CHRIA allows a licensing board *discretion* to refuse to grant or renew a license or suspend or revoke any license where the applicant has been convicted of a felony or of a misdemeanor related to his profession or occupation. 18 Pa. C.S. §9124(c) (boards may refuse to grant or suspend or revoke). "CHRIA is a general law that authorizes, but does not require, an agency to suspend a license upon the licensee's felony conviction." *Bentley v. Bureau of Prof'l and Occupational Affairs, State Bd. of Cosmetology*, 179 A.3d 1196, 1203 (Pa. Cmwlth. 2018).

> CHRIA does not provide standards for the exercise of the
> agency's discretion under Section 9124(c)(1). By

---

[21] In *Garner*, we held that Section 9124(c) of CHRIA did not limit the application of Section 7 of the Optometry Act, Act of June 6, 1980, P.L. 197, *as amended*, 63 P.S. §244.7.

contrast, the specific, and more relevant statute, is the [Barber License Law], and it does not authorize any discipline for criminal convictions unrelated to the practice of the profession. This makes a licensee's evidence of mitigating circumstances critical where presented.

*Id.*

Because, under CHRIA, the only criterion for imposing the most extreme sanction is a felony conviction, review for abuse of discretion is not undertaken lightly. *Bentley.* Although no constitutional issues are raised in this appeal, we are mindful that our Supreme Court has consistently interpreted Article 1, Section 1 of the Pennsylvania Constitution as guaranteeing an individual's right to engage in any of the common occupations of life.[22]

While public safety is of considerable importance, the Board's decision rests largely on speculative concerns. In sharp contrast to the definition that triggers employment-related protections for children under the CPSL, *i.e.*, regular and repeated contact with children, the Board based its decision to revoke King's barber licenses on mere supposition that King could *potentially* be an instructor to female students under the age of 18 or have contact with minor clients.[23] In *Abruzzese v. Bureau of Prof'l and Occupational Affairs, State Bd. of Cosmetology*, 185 A.3d at 446 (Pa. Cmwlth. 2018), we held that such reasoning is flawed.[24] Moreover, the

[22] *See, e.g.*, *Adler v. Montefiore Hosp. Ass'n of W. Pa.*, 311 A.2d 634 (Pa. 1973), *cert. denied*, 414 U.S. 1131 (1974); *State Bd. of Pharmacy v. Pastor*, 272 A.2d 487 (Pa. 1971); *Gambone v. Commonwealth*, 101 A.2d 634 (Pa. 1954).

[23] The Board did not address testimony that King would not be unsupervised or alone with minors.

[24] In *Abruzzese*, we held that the Board of Cosmetology abused its discretion by assuming facts not in evidence and basing its decision to suspend an esthetician's license in part on its speculative concern that patrons of a cosmetology salon were vulnerable and often separated from their personal belongings.

23

speculative concerns invoked by the Board "arise[] from the fact that a barbershop is a commercial establishment, not from the nature of barbering as a licensed profession, and would be equally present in other commercial establishments, such as corner grocery or convenience stores, that are not subject to professional licensure requirements." *Fulton*, 169 A.3d at 726. Additionally, we are troubled that, in failing to consider the passage of time as mandated by *John's Vending*, "the Board's approach seemingly assumes bad moral character forever and no possibility for rehabilitation . . . ." *Levengood v. Bureau of Professional and Occupational Affairs, State Bd. of Vehicle Manufacturers, Dealers and Salespersons,* (Pa. Cmwlth., No. 947 C.D. 2017, filed May 10, 2018.)[25]

In sum, where the statute delegates discretionary authority to revoke a professional license without establishing standards; our Supreme Court mandates consideration of the passage of time; the General Assembly has enacted other statutes that are specifically aimed at addressing the Board's concerns; and Pennsylvania law recognizes an individual's right to lawful employment, we conclude that the Board's imposition of the maximum sanction under CHRIA exceeds what is reasonable with respect to the state interest it asserts. *John's Vending*, 309 A.2d at 361.

Accordingly, we conclude that the Board's revocation of King's barber licenses constitutes an abuse of discretion, and we reverse.

---

[25] *See* Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a) ("Parties may . . . cite an unreported panel decision of this court issued after January 15, 2008, for its persuasive value, but not as binding precedent.").

24

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Andrew King,                          :
                                            :
                          Petitioner        :
                                            :
              v.                            : No. 68 C.D. 2017
                                            :
Bureau of Professional and                  :
Occupational Affairs, State                 :
Board of Barber Examiners,                  :
                                            :
                          Respondent        :

O R D E R

AND NOW, this 4th day of October, 2018, the December 23, 2016 final adjudication and order of the Bureau of Professional and Occupational Affairs, State Board of Barber Examiners revoking David Andrew King's licenses to practice as a barber, barber manager, and barber teacher is REVERSED.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Andrew King,                         :
                   Petitioner             :
                                          :     No. 68 C.D. 2017
          v.                              :
                                          :     Submitted:  February 7, 2018
Bureau of Professional and                :
Occupational Affairs, State               :
Board of Barber Examiners,                :
                   Respondent             :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


CONCURRING OPINION
BY JUDGE McCULLOUGH                        FILED:  October 4, 2018


          I concur in the result reached by the Majority.  I write separately to address my concerns regarding the continued supervision of David Andrew King in the course of performing his duties as a barber instructor consistent with his barber teacher license.

          King admitted to all of the factual allegations set forth in the order to show cause issued by the State Board of Barber Examiners.  These allegations included the fact that King was found guilty on a charge of involuntary deviate

sexual intercourse, a felony of the first degree.[1]  (R.R. at 2a-3a.)  As a result of his convictions, King was sentenced to a term of incarceration of 5 to 10 years in a state correctional institution, plus 10 years of probation, restricted to supervised contact with girls under the age of 18, and subjected to lifetime sex offender registration. (R.R. at 30a, 60a.)  While King has remained gainfully employed as a barber instructor at World A Cuts Barber Institute (World A Cuts) since shortly after his release on parole on May 12, 2012,[2] such fact does not diminish the seriousness and severity of the crimes he committed against a minor child.  Further, it appears from the record that King's probation will continue for another four years, until 2022.

Certainly, I support and recognize the state's commitment to rehabilitate persons convicted of crimes and to arm them with skills to become productive members of society.  Section 91.2 of Department of Corrections' (DOC) Regulations, 37 Pa. Code § 91.2 ("It is the goal of [DOC] to operate its institutions and programs to provide . . . a safe and humane environment and opportunities for rehabilitation for the inmates.").  These principles emanate from the precepts enunciated by William Penn in his Frame of Government and the ensuing laws. "When incarceration was required it was to be in 'houses of Correction' . . . where

---

[1] King was also convicted of several first-degree misdemeanors, including indecent assault of a person under 13 years of age, indecent exposure, and corruption of minors.  (Reproduced Record (R.R.) at 10a.)  The victim in that case was King's stepdaughter and the abuse occurred over a period of several years, from the time the girl was 7 to 10 years old.  (R.R. at 27a.)

[2] One of King's parole conditions required that he maintain gainful employment.  (R.R. at 52a.)  In fact, Michael Welsh, King's parole agent, testified that King has been a model participant in a required group therapeutic program and has fully complied with all of his parole conditions. (R.R. at 52a-54a.)

Friends[3] believed offenders might be redeemed." *Our Documentary Heritage:  The "Great Law" – December 7, 1682*, PENNSYLVANIA HISTORICAL & MUSEUM COMMISSION,  http://www.phmc.state.pa.us/portal/communities/documents/1681-1776/great-law.html (last visited Sept. 25, 2018).

Further, the law clearly favors allowing a person the right to choose one's occupation. *See Johnson v. Allegheny Intermediate Unit*, 59 A.3d 10, 20 (Pa. Cmwlth. 2012) ("One of the rights Article I, Section 1 [of the Pennsylvania Constitution, Pa. Const. art. I, §1] guarantees is an individual's right to engage in any of the common occupations of life.").  Notwithstanding, this Court has held that "the General Assembly may enact laws that limit an individual's right to pursue a lawful occupation in order to achieve an important government interest, such as protecting [] children . . . from abuse." *Peake v. Commonwealth*, 132 A.3d 506, 521 (Pa. Cmwlth. 2015).

The evidence of record, namely the testimony of Patrick Winter, owner of World A Cuts, revealed that all students of World A Cuts must be at least 18 years of age, but that the students of the school may occasionally service walk-in customers who are under 18 years of age and accompanied by their parents.  (R.R. at 68a.)  Furthermore, Winter testified that the entire school is under 24-hour ADT security camera surveillance.  *Id.*

Our primary concern must be for the protection of any minors that may come into contact with King, as evidenced by the lengthy term of probation and lifetime sex offender registration requirement imposed by the sentencing court.  However, under the limited facts of this case, especially given King's compliance

---

[3] The term "Friends" refers to the Quakers, otherwise known as the Society of Friends.

with his parole conditions, his continued supervision in the course of his employment with World A Cuts, and his lifetime sex offender registration requirement, I concur in the result reached by the Majority.

_____
PATRICIA A. McCULLOUGH, Judge